52

PRESSED STEEL TANK COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 101099.    Promulgated January 8, 1942.

*Malcolm K. Whyte, Esq.*, and *John S. Best, Esq.*, for the petitioner.
*D. A. Taylor, Esq.*, for the respondent.

56

OPINION.

Tyson: The Act of March 27, 1934, 48 Stat. 503, commonly known as the Vinson Act or the Vinson-Trammel Act, authorizes the President to undertake the construction of certain naval vessels and naval aircraft. Section 3 thereof provides, in part, as follows:

The Secretary of the Navy is hereby directed to submit annually to the Bureau of the Budget estimates for the construction of the foregoing vessels and aircraft; and there is hereby authorized to be appropriated such sums as may be necessary to carry into effect the provisions of this Act: *Provided,* That no contract shall be made by the Secretary of the Navy for the construction and/or manufacture of any complete naval vessel or aircraft, or any portion thereof, herein, heretofore, or hereafter authorized unless the contractor agrees—

(a) To make a report * * * under oath, to the Secretary of the Navy upon the completion of the contract.

(b) To pay into the Treasury profit, as hereinafter provided shall be determined by the Treasury Department, in excess of 10 per centum of the total contract price, such amount to become the property of the United States: *Provided,* That if such amount is not voluntarily paid the Secretary of the Treasury may collect the same under the usual methods employed under the internal revenue laws to collect Federal income taxes.

Section 3 limits the contracts referred to therein to those where the award exceeds $10,000 and subdivision (b) thereof, as amended by the Act of June 25, 1936, 49 Stat. 1926, further provides that if the amount to be paid into the Treasury is not voluntarily paid:

\* \* \* the Secretary of the Treasury shall collect the same under the usual methods employed under the internal-revenue laws to collect Federal income taxes: *Provided further,* That all provisions of law (including penalties) applicable with respect to the taxes imposed by Title I of the Revenue Act of 1934, and not inconsistent with this section, shall be applicable with respect to the assessment, collection, or payment of excess profits to the Treasury as provided by this section, and to refunds by the Treasury of overpayments of excess profits into the Treasury: \* \* \* *And provided further,* That \* \* \* the above provisos relating to the assessment, collection, payment, or refunding of excess profit to or by the Treasury shall be retroactive to March 27, 1934.

The petitioner in the contract involved agreed to comply with all of the provisions of the above mentioned section 3 and about a year after completion of the contract it filed a report of its profit, showing no excess payable to the collector. The Commissioner made a computation of the profit, and on the basis thereof, determined a liability for excess profit in the amount of $4,356.13. The petitioner does not question the correctness of such computation.

The petitioner denies liability under the statute for excess profit in any amount upon the ground that the contract was not one for the manufacture of a portion of a complete naval vessel and that, therefore, it is not within the scope of section 3, *supra,* and can not be brought within that scope merely because of provisions of the Vinson Act being inserted therein.

The petitioner points out that the Vinson Act was passed for the purpose of building the Navy up to treaty strength under the limitations of naval armament treaties of 1922 and 1930 and it urges that, since those treaties do not limit the number and size of torpedoes, the application of section 3 should be confined to the construction of vessels and aircraft and not extended to materials and supplies which are not limited by the treaties and which do not affect the size of the Navy or the tonnage of vessels. We must reject this view. Section 3 is not limited in its scope to carrying out the purpose of the treaties. It is primarily directed to the limitation of the profits of private persons making contracts with the United States for the construction of naval vessels and it extends to any naval vessel, whether authorized by the Vinson Act or by any previous or subsequent act. In our opinion the question whether section 3 applies to materials of the kind here involved is to be determined upon a consideration of the language used therein rather than of the purposes sought to be accomplished by the treaties.

The principal argument made by the petitioner is that the shells involved are designed to form parts of projectiles suitable for propulsion from a naval vessel, that they are ammunition which, when fired in war time or lost in practice, is consumed in the same manner as other consumable supplies and stores customarily carried on board the vessel, and that therefore they do not constitute a part of a complete naval vessel.

The respondent contends that a "complete naval vessel", as used in the statute, means the new naval vessel itself and all the items of equipment and outfit which are necessary for the performance by it of military service and that the initial supplies of shells are essential portions of a complete new naval vessel and constitute permanent parts thereof until they are lost or destroyed.

A complete new naval vessel, as the evidence shows, consists not only of the hull and machinery, but also of the armor and armament and a wide variety of equipment or "outfit", as it is called in naval circles. It is a custom of the Navy Department, prevailing since 1883, in the construction of a new naval vessel to furnish and equip it, before it is commissioned and placed in service, with all the necessary ammunition, powder, torpedoes, and shells, which are known as the "original outfit" or "first fill" of such supplies. The shells manufactured by the petitioner were ordered specifically for that purpose. The evidence further shows that after a vessel has been commissioned and placed in service the ammunition or torpedoes required to replace the original outfit of such items are supplied from the general stock of the naval establishment, which is purchased out of appropriations provided for the maintenance of the Navy and not out of appropriations in connection with the construction of a new vessel.

The question for determination is whether shells such as those covered by the contract here involved manufactured for the original outfit of a new destroyer constitute a "portion" of a "complete" destroyer constructed for the Navy within the meaning of section 3, *supra*.

In construing the statute little aid is to be obtained from the application of the ordinary meaning of the words "complete" and "portion" as applied to a new naval vessel. The word "complete" means entire, or with no part, item, or element lacking; and the word "portion" means a part, either separated from a whole, or merely considered by itself without actual separation. Webster's New International Dictionary. The shell comprising a part of a torpedo is an article which is not attached to the vessel, but the question remains whether it is an essential item, element, or portion of a complete new naval vessel. It is obvious that "the purpose of the language used is, therefore, not so plainly apparent as to preclude resort to judicial interpretation" and that "if effect is to be given to the true intent of Congress, we must avail ourselves of sources of information other than the language of the Act in order to aid us in the disclosure of that intention." *United States* v. *Jackson*, 280 U. S. 183, 193.

There are familiar and approved sources of information from which light may be obtained upon the proper construction to be given to section 3, *supra*. As stated in the *Jackson* case:

It is a familiar rule of statutory construction that great weight is properly to be given to the construction consistently given to a statute by the Executive Department charged with its administration. *United States* v. *Cerecedo Hermanos y Compania*, 209 U. S. 337; *Robertson* v. *Downing*, 127 U. S. 607; *United States* v. *Healey*, 160 U. S. 136; and such construction is not to be overturned unless clearly wrong, or unless a different construction is plainly required. *United States* v. *Johnston*, 124 U. S. 236, 253; *Hawley* v. *Diller*, 178 U. S. 476, 488.

See also *Universal Battery Co.* v. *United States*, 281 U. S. 580; *Walker Manufacturing Co.* v. *United States*, 65 Ct. Cls. 394; certiorari denied, 278 U. S. 617.

The construction of naval vessels has been delegated by Congress to the Navy Department and has been for many years carried out by that department, subject to the direction of Congress as to the number and classes of vessels to be built and the total amount to be expended upon each vessel. Under the organization of the Navy Department, the function of procuring the materials which enter into the construction and equipment of a new vessel was, at all times material here, divided between the Bureau of Construction and Repair and the Bureau of Engineering, on the one part, and the Bureau of Ordnance, on the other, and, in recognition of the separate functions of these bureaus, and for convenience, Congress, in appropriating funds for construction of new naval vessels, has earmarked the amounts to be expended for "Construction and Machinery", which are within the supervision of the two bureaus first above mentioned, and the amounts to be expended for "Armor, Armaments, and Ammunition", which are within the supervision of the Bureau of Ordnance. Thus Congress has provided for the purchase of ammunition, including torpedoes for new vessels, out of funds specifically appropriated for construction purposes, and it appears that both long before (from 1883) and since the enactment of the Vinson Act it has been the practice of the Navy Department to provide the new vessel, before it is commissioned, with an initial supply of ammunition, which uniformly has been charged against the construction funds for a complete new naval vessel and that such practice has been followed with the knowledge of Congress and has been approved by it in the consideration of the budget estimates and the authorization of expenditures from year to year for such vessels. The initial supply of ammunition has, during all this time, been treated by the officials of the Navy Department as a proper item of cost of a complete new naval vessel for the reason that ammunition is essential to the performance by the vessel of its primary function—to fire ammunition.

When the Vinson Act was passed, the Navy Department and its Bureau of Supplies and Accounts, which is charged with making contracts for all ammunition, including that purchased for new vessels, interpreted the profit-limiting provisions of section 3 as applicable to all contracts for furnishing ammunition intended for the initial supply of new naval vessels, including torpedoes, powder, and shells. In making such contracts, including the one here involved, the Navy Department has consistently included in the contracts provisions requiring the contractor to comply with section 3, *supra.*

After the Vinson Act had been in force for about a year the Navy Department sought to have it amended so as to exempt from its profits-bearing provisions contracts for certain scientific equipment used on new naval vessels. In the course of the hearings on this proposed amendment before the Committee on Naval Affairs of the House of Representatives (Hearings on Sundry Legislation Affecting the Naval Establishment, 1935, 74th Cong., 1st sess.) the then chief of the Bureau of Construction and Repair explained the scope of section 3, *supra,* as it up to that time had been interpreted and administered by the Navy Department. He testified (pp. 1518, 1524):

> The Vinson-Trammel bill as it finally passed the Congress contains certain restrictive clauses which vitiates the value of the bill as a piece of legislation. I refer specifically to the restrictions and requirements placed around the 10-percent profit clause. In my judgment, the 10-percent profit clause should be applied and applied only to the ship contract itself, that is, to the contracts made by the Navy Department through the Judge Advocate General for ships; or in case the hull of the ship and the propelling machinery are purchased separately then this clause should apply to both of them. It should, however, not apply to contracts, for material, made by the Bureau of Supplies and Accounts. * * *

> That [the portion of the contract made through the Judge Advocate General's office] consists of the ship and everything that you gentlemen appropriate for known as "construction and machinery". In some cases, as submarines, we buy ships from one firm and engines from another. It would apply to both. What I want to get is "construction and machinery" of the ship under the 10-percent clause and nothing else.

In the Act of June 25, 1936, Congress provided for the exemption from the profit limiting provisions of the Vinson Act contracts for scientific equipment used on new naval vessels, but made no change affecting the departmental interpretation of the Act of 1934 as to ammunition and torpedoes being included within the provisions of section 3, *supra,* and that interpretation has continuously been applied up to the present time.

In a somewhat similar situation, presented in *United States* v. *Jackson, supra,* the Supreme Court said:

> * * * If there were any doubt on the question, the silence of Congress in the face of the long continued practice of the Department of the Interior in construing statutes which refer only to Indian "allottees" or Indian "allot-

ments," as applicable also to Indians claiming under the homestead laws, must be considered as "equivalent to consent to continue the practice until the power was revoked by some subsequent action by Congress." *United States* v. *Midwest Oil Co.*, 236 U. S. 459, 481.

The language found in section 3, *supra*, does not, in our opinion, require a different construction from that placed thereon by the Navy Department and sanctioned by Congress through a long period of years and we, therefore, hold that its provisions are applicable to the contract of the petitioner of June 8, 1935.

Moreover, in our opinion, we must hold that section 3 of the Vinson Act is applicable to the contract of the petitioner for a further reason.

The Vinson Act is not a separate and isolated piece of legislation, so far as it relates to the construction of complete naval vessels, or portions thereof, but is one of many acts constituting part of a uniform system consistently followed since 1883 for the purpose of providing new vessels for the Navy. Under that system it has been the practice of Congress, in the first instance, to provide, through authorization acts, for the construction of new naval vessels, and thereafter to supplement the authorization acts by providing in appropriation acts for the funds necessary for such construction. The subject matter dealt with by all of these acts is identical—complete new naval vessels and their construction. Therefore, the appropriation acts passed to carry out the provisions of the Vinson Act are (as were the appropriation acts and authorization acts passed prior to the Vinson Act for the same purpose) *in pari materia* with the Vinson Act and, there being doubt as to what is embraced within the words "a complete naval vessel * * * or any portion thereof", as used in section 3 of that act, it is proper, for the purpose of ascertaining the meaning which Congress attached to those words, to consider the language of the appropriation acts and to read them as if they, together with the Vinson Act, constituted one law. *United States* v. *Freeman*, 3 How. 556, 564, 565; *Ryan* v. *Carter*, 93 U. S. 78; *Tiger* v. *Western Investment Co.*, 221 U. S. 286, 309; *Commissioner* v. *Gottlieb*, 265 U. S. 310; Lewis Sutherland Stat. Constr., 2d ed., ¶ 443; 59 C. J. 1042, 1048; 25 R. C. L. 1060, 1064. The principle is applicable where appropriation acts are involved. *Converse* v. *United States*, 21 How. 463, 467; see also *State* v. *Hackney*, 275 Mo. 47; 204 S. W. 513.

The appropriation acts, including those made under the authorization contained in the Vinson Act, have uniformly provided for the expenditure of funds under the headings, "Construction and Machinery" and "Armor, Armament, and Ammunition" for complete new naval vessels authorized to be constructed under authorization acts. By this specific reference to "ammunition" Congress has clearly mani-

fested an intention to include that class of items in the amounts to be expended on complete new naval vessels; and ammunition without question embraces shells or torpedo heads of the kind here involved. When such a provision in the appropriation acts applicable to the vessels to be constructed under the Vinson Act is considered as *in pari materia* with section 3 of that act, "authorizing to be appropriated such sums as may be necessary to carry into effect the provisions" of the act, the conclusion is inescapable that Congress intended that the profit-limiting provisions of the Vinson Act should apply to contracts for furnishing ammunition, including shells such as those here in question, required for outfitting newly constructed complete naval vessels. This construction leads to consistency in all parts of the system for providing complete new naval vessels and to uniformity in its operation.

In view of our conclusion that the provisions of section 3, *supra*, are applicable to the contract in question, it becomes unnecessary for us to consider the petitioner's contention that the provisions of the Vinson Act which were incorporated in the written contract should be disregarded as surplusage, or to consider the Commissioner's contentions that the petitioner is bound by its voluntary agreement as evidenced by its contract to pay the excess profit and that it is, under the circumstances presented by this record, estopped to deny liability for the deficiency.

Reviewed by the Board.

*Decision will be entered for the respondent.*

SMITH dissents.

---

HILL, dissenting: I assume, for this discussion, that the petitioner by virtue of contract is obligated to pay into the Treasury the amount of its net profit, if any, in excess of 10 percent of the contract price for the manufacturing operation herein involved. It is only in the event such contract obligation was required by section 3 of the Vinson Act that respondent is authorized to enforce it "under the usual methods employed under the internal revenue laws to collect Federal income taxes." We are not here concerned with the enforcement of an obligation other than one created under the requirements of the Vinson Act.

Section 3 of that act is or is not applicable herein solely by virtue of its own provisions. If the facts in a given case do not make the provisions of the act applicable, application thereof can not be invoked by contract. Specifically, if the facts in the instant proceeding are not covered by the Vinson Act, the contract involved herein did not invest the respondent with authority to collect the amount claimed to be due "under the methods employed under the internal revenue

laws to collect Federal income taxes." That authority can be conferred only by a statute.

The determinative question is whether the shells here involved constituted a portion of a complete naval vessel. If so the Vinson Act is applicable; otherwise it is not. The fact that funds for the initial supply of ammunition for newly constructed naval vessels are provided by Congressional appropriations under the heading "Increase of the Navy" does not constitute such ammunition a "portion" of a "complete" naval vessel. It is or is not such a portion regardless of the language of the appropriations act providing funds for its purchase.

It is my view that a supply of ammunition is not necessary in order that there be a complete naval vessel, and that the contract obligation herein sought to be enforced is not one required by the provisions of the Vinson Act. If a naval vessel is incomplete within the purview of the Vinson Act until it is provided with the initial supply of ammunition, it would also be incomplete upon the exhaustion of such initial or a subsequent supply of ammunition. Consistently with such interpretation, every recurring subsequent supply of ammunition for a naval vessel would be a "portion" of the complete vessel and its procurement would have to be made in compliance with the Vinson Act. It appears to be conceded that renewals of ammunition supplies for naval vessels are made from the general stock of ammunition in the Naval establishment and that the ammunition in such general stock is not required to be procured or supplied under the provisions of the Vinson Act. It is readily conceivable that the initial supply of ammunition for a newly constructed naval vessel might be drawn from such general stock instead of being procured directly from a manufacturer or distributor specifically for such vessel. In such event the Vinson Act would concededly have no application thereto. Yet if such initial supply of ammunition received from a manufacturer or vendor for the specific purpose of equipping a certain newly constructed naval vessel is a "portion" of the complete naval vessel, then the initial supply of such ammunition for such vessel taken from the general stock of the Navy Department would also be a "portion" of a complete naval vessel. However, it appears that in the former case the Navy Department and the appropriations committees of Congress regard the expense of such ammunition as cost and in the latter case as maintenance of the naval vessel. It is not apparent to me why in the illustration given the expense of supplying such ammunition should be cost in the one instance and maintenance in the other or why the initial supply of ammunition for a naval vessel should represent cost thereof and that subsequent or renewal supplies of such ammunition should represent maintenance. It is my opinion that a complete naval vessel within the purview of the Vinson Act does not

include either the initial or a subsequent supply of ammunition such as is involved in this proceeding or at all and that, therefore, there is no warrant in law for the remedy here pursued for the collection of the amount due, if any, under the alleged contract obligation herein involved. In other words, the obligation, if any, of petitioner is not enforceable "under the usual methods employed under the internal revenue laws to collect Federal income taxes."