ALUMINUM COMPANY OF AMERICA, PETITIONER, *v.* COMMISSIONER OF
INTERNAL REVENUE, RESPONDENT.

Docket No. 103316, 106514.   Promulgated August 13, 1942.

*Paul G. Rodewald, Esq.*, and *David B. Buerger, Esq.*, for the
petitioner.

*William A. Schmitt, Esq.*, for the respondent.

# 550

OPINION.

VAN FOSSAN: The main issue presented in these proceedings is whether section 3 (e) of the Vinson Act of March 27, 1934 [1] (amended June 25, 1936, 49 Stat. 1926, with no effect on the issue) requires the petitioner as a subcontractor to pay into the Treasury all its profits in excess of 10 percent of the contract price of the materials furnished to prime contractors or to fabricators from whom prime contractors eventually obtained them. The petitioner argues that by all recognized standards of definition, custom, and law it is a materialman and can not be considered a subcontractor subject to the Vinson Act.

The respondent's position is that the primary purpose of the Vinson Act was to limit profits on materials going into Government vessels and that, for that reason, the word "subcontractor" as found in the act took on a different and broader meaning, comprehensive enough to include a materialman therein.

The respondent confesses that, for the purposes of the Vinson Act, he makes no attempt to define a materialman as distinguished from a subcontractor. He contends that both are comprehended in the term

---

[1] SEC. 3. The Secretary of the Navy is hereby directed to submit annually to the Bureau of the Budget estimates for the construction of the foregoing vessels and aircraft; and there is hereby authorized to be appropriated such sums as may be necessary to carry into effect the provisions of this Act : *Provided,* That no contract shall be made by the Secretary of the Navy for the construction and/or manufacture of any complete naval vessel or aircraft, or any portion thereof, herein, heretofore, or hereafter authorized unless the contractor agrees—

(a) To make a report, as hereinafter described, under oath, to the Secretary of the Navy upon the completion of the contract.

(b) To pay into the Treasury profit, as hereinafter provided shall be determined by the Treasury Department, in excess of 10 per centum of the total contract prices, of such contracts within the scope of this section as are completed by the particular contracting party within the income taxable year, such amount to become the property of the United States, but the surety under such contracts shall not be liable for the payment of such excess profit ; * * *.

(c) To make no subdivisions of any contract or subcontract for the same article or articles for the purpose of evading the provisions of this Act, but any subdivision of any contract or subcontract involving an amount in excess of $10,000 shall be subject to the conditions herein prescribed.

*     *     *     *     *     *     *

(e) To make no subcontract unless the subcontractor agrees to the foregoing conditions.

The report shall be in form prescribed by the Secretary of the Navy and shall state the total contract price, the cost of performing the contract, the net income, and the percentum such net income bears to the contract price. A copy of such report shall be transmitted to the Secretary of the Treasury for consideration in connection with the Federal income tax returns of the contractor for the taxable year or years concerned.

The method of ascertaining the amount of excess profit to be paid into the Treasury shall be determined by the Secretary of the Treasury in agreement with the Secretary of the Navy and made available to the public. The method initially fixed upon shall be so determined on or before June 30, 1934 : *Provided,* That in any case where an excess profit may be found to be owing to the United States in consequence hereof, the Secretary of the Treasury shall allow credit for any Federal income taxes paid or remaining to be paid upon the amount of such excess profit.

The contract or subcontracts referred to herein are limited to those where the award exceeds $10,000.

"subcontractor." He likewise does not try to disprove the petitioner's contention that there is a well defined and universally accepted distinction in the meaning of the two words and that they can not be used interchangeably.

The respondent argues that article 2 of regulations promulgated January 6, 1937 (T. D. 4723, C. B. 1937–1, p. 519),[2] propounds a correct interpretation of the Vinson Act. His argument is largely in support of the validity of the broadened definition of a subcontractor as set forth therein. We note that previous regulations (T. D. 4434, XIII–1 C. B. 540) contain no such language.

In so far as we can ascertain, the present issue presents a new aspect of the Vinson Act, its scope and effect. We are asked to adopt either the view urged by petitioner that the provisions of the act must be interpreted according to the usual meaning of their component words, or the theory urged by respondent that the act itself sets up new criteria which must be substituted in order to conform to what the respondent terms the prevention of profiteering in constructing combat vessels and "limiting profits on national defense projects."

We believe the first view to be the correct one. Much might be said for the desirability of restricting profit on naval vessels and aircraft to a maximum of 10 percent on every individual article and all labor and raw material directly or indirectly required to construct and service the completed craft. However, much also can be said against the practicability of such a limitation. Many common articles, materials, and supplies ordinarily purchased on the open market might, because of the attendant uncertainty of ultimate profit, become practically unobtainable in the market because of the fear of a later forced return of profits over 10 percent. Thus, the Navy might be hampered, not helped, by the respondent's construction of the law.

In the respondent's "explanatory statement" he states that the materials under consideration "found their way" into a complete naval vessel or aircraft constructed under the Vinson Act. He thus includes all articles and materials furnished by the petitioner as they are governed by the first issue. Assuming that such articles and materials were destined to become a part of a naval vessel or aircraft, we still

[2] ART. 2. *Contracts and subcontracts under which excess profit liability may be incurred.*—Except as otherwise provided with respect to contracts or subcontracts for certain scientific equipment (see article 3 of these regulations), every contract awarded for an amount exceeding $10,000 and entered into after the enactment of the Act of March 27, 1934, for the construction or manufacture of any complete naval vessel or aircraft, or any portion thereof, is subject to the provisions of the Act relating to excess profit liability. Any subcontract made with respect to such a contract and involving an amount in excess of $10,000 is also within the scope of the Act. If a contracting party places orders with another party, aggregating an amount in excess of $10,000, for articles or materials which constitute a part of the cost of performing the contract or subcontract, the placing of such orders shall constitute a subcontract within the scope of the Act, unless it is clearly shown that each of the orders involving $10,000 or less is a bona fide separate and distinct subcontract and not a subdivision made for the purpose of evading the provisions of the Act.

are unable to conclude that the terms of the Vinson Act control the amounts of the producer's profit thereon. The act specifically states that the contractor must agree to make no subcontract unless the subcontractor agrees to the conditions specified in the act. Thus, unless the petitioner is a subcontractor or can be construed to be one, he is not subject to the act.

We deem it unnecessary to enter into a lengthy discussion of the differentiating characteristics and attributes of materialmen and subcontractors. Many state and other decisions make the distinction plain.

The act does not define the word "subcontractor." Webster's Dictionary defines the noun "subcontract" as "a contract under, or subordinate to, a previous contract", and the verb as "to contract under, or for the performance of a part or all of another contract." The same dictionary defines a "materialman" as "one who supplies both labor and material in the construction of buildings, ships, etc." It is obvious from the record that the petitioner was strictly a materialman except as to those contracts in which it was a prime contractor.

The petitioner did not undertake to perform all or any part of the Navy contracts in question. It merely furnished materials suitable for use by the prime contractor. The respondent stresses the fact that in the various orders and memoranda describing the sales made to the prime contractor the Vinson Act and its provisions were specifically mentioned. These notations obviously were either printed or stamped as a matter of routine and were so indicated in order to assure the purchaser that the material would meet the tests established by the Navy Department. The record further shows that such orders were *possibly* subject to the Vinson Act. The excess percentage was to be paid over only if that act required it—the precise issue which we must decide.

Performance according to a "specification governing the original contract" does not mean that the contractor may not buy in the open market articles which meet the required tests. Inspection at the plant may be a convenient method of accelerating the completion of the contract. The inspection of articles in the stock pile of a prospective furnisher of raw material or parts serves the same purpose. but does not make such seller to the contractor his subcontractor.

In the case at bar, meeting the Navy specifications does not impute a Navy contract. Articles may be made of prescribed size, strength, and consistency under an agreement between a Navy contractor and a materialman. Such articles may be used on a Navy contract, at the contractor's option, as appears here. Their quality may or may not make them satisfactory for use on other jobs.

The petitioner's stock, including both raw materials, sheet and plate aluminum, and articles catalogued for commercial use, thus must meet *at least* the requirements of Navy specifications. It is possible that aluminum articles or parts may be made for certain types of private consumption under specifications which require greater precision of manufacture and fineness of quality than those demanded by the Navy. The publication of Navy specifications, the inspection of stock material by Navy inspectors, and the notation of such requirements on orders do not serve to transform a materialman into a subcontractor. Nor does a regulation declaring a subcontractor and materialman to be in the same category make them so. The "enlargement of the ordinary routine definition" by T. D. 4723. as the respondent denominates the effect of that Treasury decision, is not warranted.

In view of what we have said concerning the distinguishing features of the concepts of "materialman" and "subcontractor", we conclude that Congress intended to confine the effect of the Vinson Act restrictions to subcontractors in the commonly accepted legal meaning of the word and thus to exclude materialmen, such as the petitioner. *Old Colony Railroad Co.* v. *Commissioner*, 284 U. S. 552. See *Matzinger* v. *Harvard Lumber Co.*, 115 Ohio St. 555; 155 N. E. 131 (and cases cited); *Baker* v. *Yakima Valley Canal Co.*, 77 Wash. 70; 137 Pac. 342; *Marsh* v. *Rothey*, 117 W. Va. 94; 183 S. E. 914.

In other instances of Federal legislation both subcontractors and materialmen have been specifically mentioned. In the District of Columbia Mechanic's Lien Act of March 3, 1901, 31 Stat. 1384, and in the National Industrial Recovery Act of June 16, 1933, 48 Stat. 195, both are mentioned. In the Buy American Act on March 3, 1933, 47 Stat. 1520, the following language is used:

Every contract for the construction, alteration, or repair of any public building or work in the United States * * * shall contain a provision that in the performance of the work the contractor, subcontractors, material men, or suppliers shall use only such unmanufactured articles, materials, and supplies as have been mined or produced in the United States * * *.

The legislation most nearly parallel to the Vinson Act is the Merchant Marine Act of June 29, 1936, 49 Stat. 1998. That act has features resembling both the Vinson Act and the Buy American Act. Its section 505 (b) reads:

No contract shall be made for the construction of any vessel under this act unless the shipbuilder shall agree * * * (5) to make no subcontract unless the subcontractor agrees to the foregoing conditions.

Section 505 (a) provides:

* *. * In all such construction the shipbuilder, subcontractors, material men, or suppliers shall use, so far as practicable, only articles, materials, and supplies of the growth, production, or manufacture of the United States * * *.

Likewise, various rulings of the Navy and War Departments recognize a sharp difference between materialmen and subcontractors. Among those in point is the ruling of the Bureau of Yards and Docks of the Navy Department dated September 11, 1940, which states in part:

* * * it is desired that the distinction between subcontracts and material purchases be kept in mind in order that the making of subcontracts will be confined to cases which involve the employment on the site of supervision and labor in excess of what is ordinarily required to fix or install the material in place. While it is impracticable to lay down a general rule, the procedure can be indicated by examples * * *.

Of the same effect is the War Department construction contract form, approved June 19, 1941, and the construction of the terms by the Federal Emergency Administration of Public Works, transmitted to contractors by the Engineer Corps of the War Department, May 23, 1934, stating:

The term "Subcontractor" as used herein shall be understood to refer to a person or firm who furnishes or proposes to furnish labor and material, or labor only, on the site of the work for a specified purpose as part of a construction contract, or persons or firms who furnish or propose to furnish for a particular project, equipment, appliances or materials required to be constructed, processed, manufactured or fabricated especially for that particular project. Persons or firms who furnish or propose to furnish standard materials or equipment but no labor at the site are not to be considered as subcontractors but are to be considered as material men, sellers or vendors.

The record amply shows that, with the exception of special quilting bolt nuts and screw machine products, all of the aluminum materials sold by the petitioner under its orders and contracts with prime contractors or fabricators were either regular commercial products or required additional fabrication, treatment, alteration, or reformation. The two exceptions each aggregate less than $10,000 in price and therefore are automatically excluded from the operation of the Vinson Act. (Sec. 3 (c).)

The second issue raises the question whether the cost of materials used in performing the contract should be computed at their market value or at their original cost. For this issue also we find no precedent in adjudicated Vinson Act cases.

The point turns upon a proper interpretation of the words "the cost of performing the contract" appearing in section 3 of that act. The method of ascertaining the amount of excess profit to be paid to the Treasury is determined by the Secretary of the Treasury in agreement with the Secretary of the Navy. Pursuant to that authority, T. D. 4434 (C. B. XIII–1, p. 540), was issued jointly by the Acting Secretary of the Treasury and the Acting Secretary of the Navy.

T. D. 4434 states in part:

The method of ascertaining the amount of excess profit to be paid to the United States in respect of contracts entered into under the Vinson Act shall be as follows:

The excess profit shall be determined on each contract separately upon the completion or other termination of the contract. The amount of such excess profit shall be the amount of the profit on the contract in excess of 10 per cent of the total contract price. The amount of the profit on the contract shall be the difference between the total contract price and the cost of performing the contract. The cost of performing the contract shall be the direct costs, such as material and labor, incurred by the contractor in performing the contract, plus a reasonable proportion of any indirect costs (including overhead or general expenses) appertaining to the contract which are not usually directly allocated to the cost of performing the contract. No general rule may be stated for ascertaining the reasonable proportion of the indirect costs to be allocated to the cost of performing a contract which would be applicable to all cases. * * *

We believe that the language of the statute means precisely what it says. The "cost" of performing the contract is what the operation actually cost the petitioner, not what it would have cost it assuming it had purchased its materials at market price. The petitioner's theory, carried to its logical conclusion, would require that all computation of cost should be made on a fair market value of all materials—and even labor—irrespective of the actual cost thereof to it.

Under petitioner's contention, if, through quantity purchases by or forced sales to the contractor, materials were acquired under terms of great advantage to the contractor, he would not be compelled to pay any part of such excess profit to the Treasury. Furthermore, a corporate contractor might "departmentalize" its various processes of manufacture or fabrication through its subsidiaries or allied corporations. By this means a profit would attach to all of the principal constituent parts of the finished products. The fundamental purpose of the Vinson Act would thereby be defeated.

Funk & Wagnalls' New Standard Dictionary defines cost as "that which has been given for a thing in order to procure it; especially the price paid; outlay of any kind; expense." In 20 Corpus Juris Secundum, p. 241, we find this definition, "the amount originally expended in performing a particular act or operation or for production or construction as of a building." See Black's Law Dictionary, 3d ed., p. 446; *Buck* v. *Buck*, 18 N. Y. 337; *Kempf* v. *Ranger*, 132 Minn. 65; 155 N. W. 1059; *Hoggson Bros.* v. *Spiekerman*, 161 N. Y. Supp. 930; 175 App. Div. 144.

The second quoted definition closely follows the language of the Vinson Act. That act does not undertake to define the word "cost" nor the expression "the cost of performing the contract." As in the first issue, we must construe the word and the phrase in their commonly accepted legal meaning. Therefore, we are led to the

conclusion that the profit which the petitioner derived from its prime contracts with the Navy Department must be measured by the original cost of the material to it, as contended by the respondent.

The petitioner cites several cases which it claims are persuasive of the correctness of its theory. However, none of those cases relates to the exact question before us and, therefore, the citations have only a referential bearing on the issue. The petitioner also quotes the standard form of contract prescribed by the Navy Department covering "cost-plus" contracts. In that form the "material from stock" supplied by the cost-plus contractor for a specific job order is computed at the market price. The cost-plus contracts were authorized by the National Defense Act of June 28, 1940. 54 Stat. 676. That legislation contains an entirely different fundamental purpose from that of the Vinson Act and is in no way comparable thereto or controlling. The contractor on a cost-plus basis acts merely as a supervisor, superintendent, or manager of the project and his fee for such service is termed a "handling charge." A contractor governed by the provisions of the Vinson Act furnishes the finished product, which he manufactures in any way he sees fit, subject, of course, to the requirements of given specifications and to inspection by Navy authorities. His position, therefore, is quite dissimilar to that of a "cost-plus" contractor.

In view of our disposition of the first issue, it becomes unnecessary for us to decide the third and fourth issues. But see *Pressed Steel Tank Co.*, 46 B. T. A. 52; and *Douglas Aircraft Co.*, 46 B. T. A. 1025.

The computation of the deficiencies, if any, may be made under Rule 50 pursuant to the stipulated figures.

Reviewed by the Board.

*Decisions will be entered under Rule 50.*

SMITH dissents.

---

BLACK, dissenting: In all three of the taxable years, 1936, 1937, and 1938, the petitioner completed certain prime contracts, that is to say contracts made by the petitioner directly with the Government of the United States which by their terms were subject to the provisions of the Vinson Act. As to these no issue is raised as to petitioner being liable for whatever excess profits tax is due. The only issue as to these is whether, in the computation of the profit made on a contract, petitioner is entitled to use "schedule cost," as petitioner contends, or must use "original cost," as determined by the Commissioner. The majority opinion holds that "original cost" must be used, and with this holding I agree.

In addition to these prime contracts which petitioner had with the United States Government, which petitioner concedes come under the provisions of the Vinson Act, petitioner delivered aluminum mate-

rials under certain "job contracts" to prime contractors engaged in the construction of complete naval vessels. Also in addition to these petitioner sold and delivered aluminum materials pursuant to orders received from customers who were engaged in the performance of prime contracts with the Navy. As to these sales and deliveries under job contracts and under orders received from customers not under job contracts, petitioner contends that it is not subject to the provisions of the Vinson Act. The majority opinion sustains this contention and with this holding, in so far as job contracts are concerned, I do not agree.

The kinds of transactions to which I am now referring are described in the Board's findings of fact as follows:

During the years 1937 and 1938 the petitioner, pursuant to several job contracts, delivered aluminum materials to prime contractors engaged in the construction of complete naval vessels. Under the typical job contract the petitioner agreed to furnish and the prime contractor (described as the "purchaser") agreed to buy 200,000 pounds or more, not to exceed 400,000 pounds, of described aluminum material for use in the construction of a named naval vessel or vessels. Such aluminum material was to be sold at prices stated in the contract for particular classes of material, reference being made for prices to pages of the petitioner's regular published price list incorporated in the contract, but the purchaser was not required to buy any quantity of any particular class of material.

I think the "job contracts" referred to in the foregoing paragraph are subcontracts within the meaning of section 3 of the Vinson Act, quoted in the majority opinion.

It may well be that, as to the transactions described in the Board's findings of fact as follows:

The petitioner sold and delivered commercial aluminum and materials on orders received from customers. The petitioner received an order for listed materials, acknowledged such receipts on its printed form, and proceeded to fabricate and ship the materials so ordered.

the petitioner was not a subcontractor and was only a materialman and was not subject to the provisions of the Vinson Act. The opinion so holds, and I agree. True, under article 2 of Treasury Regulations promulgated January 6, 1937 (T. D. 4723, C. B. 1937-1, p. 519) mere materialmen are included within the provisions of the Vinson Act but I agree with the majority opinion that the regulation in that respect goes beyond the law and is to that extent invalid.

But when petitioner entered into these "job contracts" with a prime contractor as described in the Board's findings of fact, I think it becomes more than a mere materialman and becomes a subcontractor within the meaning of the act. For example, the Board's findings are that:

One of the said job contracts, entered into with the Bethlehem Shipbuilding Corporation, petitioner's contract No. J-5499, called for the furnishing and

purchase of standard aluminum products for use in the construction of eleven described naval vessels. Two of these vessels were completed by the Bethlehem Shipbuilding Corporation in 1937 and two in 1938. * * *

Of course, it goes without saying that the Bethlehem Shipbuilding Corporation, as the prime contractor, was subject to the provisions of the Vinson Act. As the job contractor obligated to furnish to Bethlehem Shipbuilding Corporation the aluminum material which was to go into the vessels, I think petitioner was a "subcontractor" as that term is used in the act, and, therefore, liable to the excess profits provision of the act.

The majority opinion holds to the contrary and to that holding I respectfully dissent.

ARNOLD agrees with this dissent.