**COMMISSIONER OF INTERNAL REVENUE v. ALUMINUM CO. OF AMERICA.**

No. 8302.

Circuit Court of Appeals, Third Circuit.
Argued July 13, 1943.
Decided April 28, 1944.

# 664

Bernard Chertcoff, of Washington, D. C. (Samuel O. Clark, Jr., Asst. Atty. Gen., and Sewall Key and J. Louis Monarch, Sp. Assts. to Atty. Gen., on the brief), for petitioner.

Paul G. Rodewald, of Pittsburgh, Pa. (David B. Buerger and Smith, Buchanan & Ingersoll, all of Pittsburgh, Pa., on the brief), for respondent.

Before JONES and McLAUGHLIN, Circuit Judges, and KIRKPATRICK, District Judge.

JONES, Circuit Judge.

This is a petition by the Commissioner of Internal Revenue for a review of decisions of the Board of Tax Appeals (47 B.T.A. 543). The question involved is whether the Act of March 27, 1934, c. 95, 48 Stat. 503, 34 U.S.C.A. § 496,[1] commonly known as the "Vinson Act", is applicable to profits made by the respondent on sales of materials under the circumstances disclosed by the record in this case.

Sec. 3 of the Vinson Act provides in part here material—

"*  *  *  That no contract shall be made by the Secretary of the Navy for the construction and/or manufacture of any complete naval vessel or aircraft, or any portion thereof, herein, heretofore, or hereafter authorized unless the contractor agrees [inter alia]—

*     *     *     *     *     *

"(b) To pay into the Treasury profit *  *  * in excess of 10 per centum of the total contract price, such amount to become the property of the United States: Provided, That if such amount is not voluntarily paid the Secretary of the Treasury may collect the same under the usual methods employed under the internal revenue laws to collect Federal income taxes.

"(c) To make no subdivisions of any contract or subcontract for the same article or articles for the purpose of evading the provisions of this Act, but any subdivision of any contract or subcontract involving an amount in excess of $10,000 shall be subject to the conditions herein prescribed.

*  ·     *     *     *     *     *

"(e) To make no subcontract unless the subcontractor agrees to the foregoing conditions."

[1] As amended by the Act of June 25, 1936, c. 812, 49 Stat. 1926, 34 U.S.C.A. § 496, in particulars not presently material.

The facts are undisputed and, as found by the Board of Tax Appeals from the stipulation of the parties or uncontroverted averments of the pleadings or otherwise from the record, disclose the following situation.

During the years 1937 and 1938 the respondent, which was engaged in the business of producing, purchasing and selling aluminum and its alloys either as ingot or in partly or wholly fabricated forms, delivered, pursuant to job contracts, aluminum materials to prime contractors engaged in the construction of complete naval vessels. As stated by the Board, the term, "prime contract", designates "a contract made directly with the Government of the United States and by its terms subject to the provisions of the Vinson Act." [47 B. T.A. 544] We are presently concerned with the respondent's profits on materials which it sold under job contracts or on orders to prime contractors for use in specified naval construction.

Under a typical job contract the respondent agreed to furnish, and the prime contractor agreed to buy, not less than nor more than designated amounts of described aluminum material for use in the construction of a named naval vessel or vessels. Such aluminum material was to be sold and paid for at prices stated in the contract for particular classes of material, reference being made for prices to the respondent's regular published price list incorporated in the contract, but the purchaser was not required to buy any definite quantity of any particular class of material.

One of the job contracts entered into by the respondent was with the Bethlehem Shipbuilding Corporation and called for the furnishing and purchasing of standard aluminum products for use in the construction of eleven identified naval vessels. In addition the respondent had job contracts with six other shipbuilding companies which provided for the respondent's furnishing aluminum materials for use in the construction of twelve specified naval vessels. It is unnecessary to detail the years in which the naval vessels above referred to were completed. Under the Vinson Act, as amended by the Act of 1936, supra, the calculation of excess profits was to be upon the basis of all contracts completed during the year. For present purposes, it is sufficient to state that the aluminum materials furnished by the respondent under its job contracts were delivered and used in the construction of naval vessels in the years here involved.

Save for certain quilting bolt nuts made specially for use in naval vessels, all of the aluminum materials furnished by the respondent under the seven job contracts above referred to were regular commercial products. Such products were regularly fabricated and sold by the respondent and were identical in physical and chemical properties, specification and composition with those fabricated and sold to customers generally for purposes other than naval construction. At least ninety-eight per cent of the commercial products sold by the respondent to its many general customers were used by them for purposes unrelated to construction embraced by the Vinson Act. The prices charged for the materials furnished under the respondent's job contracts were identical with the prices charged other purchasers for like materials, and the procedure in the handling of the orders, the processes of manufacture and the method of shipping and accounting were the same as those followed in the case of ordinary commercial orders.

All of the aluminum materials furnished by the respondent under the job contracts above referred to were, with the exception of screw machine products, in raw or semifinished state and required a great deal of further and extensive machining or fabrication by the prime contractors, or persons serving them, before such materials could be used in the construction of naval vessels. Thus aluminum sheet, plate, structural and extruded shapes, tubing, rivets, rod and bar, and sand castings had to be fabricated or machined for conversion by the prime contractors or their agents into new and different forms. This resulted in radical distortion, in size and shape, of the materials furnished by the respondent. The screw machine products referred to above consisted of screws, bolts and nuts which were furnished by the respondent in their finished form and required no further fabrication or machining.

In addition to the aluminum furnished by the respondent under the job contracts above referred to, it also furnished during the years here involved certain aluminum materials on orders received from customers. These materials were regular commercial products sold at prices identical with those charged other customers for like products, and the orders were handled in the same manner in which other com-

mercial orders were handled. Some of these orders were filled for two particular customers who used the materials in the manufacture of powder cans, cartridge tanks, and ammunition boxes. Such containers were not furnished to the Navy by the prime contractor, charged with the construction of a complete naval vessel, but were purchased by the Navy from other suppliers. The powder cans, cartridge tanks, and ammunition boxes were never physically attached to any naval vessel but were placed on board by the Navy after a vessel had been accepted and commissioned. These containers, while loaded, were kept on board vessels as loose supplies. Other such orders were filled by the repondent for another customer for die-casting gill rings and for tubing, which were used by the customer in the construction of equipment for ultimate installation by it or others in vessels, some of which were and some of which were not constructed under the Vinson Act.

As in the case of the materials furnished under the job contracts which related to the construction of specific naval vessels, the aluminum materials furnished by the respondent on orders from the three customers last above referred to required further extensive fabrication or machining for conversion into new and different forms, which resulted in substantial modification, in size and shape, of the material furnished by the respondent.

Pursuant to orders received by the respondent from manufacturers of aircraft or subassemblies thereof, the respondent also sold and delivered aluminum materials to thirteen such customers. Some of the materials so sold were particularly adaptable for aircraft construction, but none was adapted specially for naval or Government aircraft as distinguished from civilian aircraft, and all of them in general were commercially available. Of the total quantity of aluminum material particularly adapted for aircraft purposes which the respondent fabricated and sold during the years here involved, about twenty-five per cent was used for naval aircraft and of that amount a substantial proportion was for naval aircraft not subject to the Vinson Act.

Except for small quantities of finished screws, nuts and bolts, the aluminum material furnished by the respondent for aircraft production required, as in the case of the other materials furnished by the respondent to which we have already referred, further extensive fabrication or machining for conversion into new and different forms, which resulted in radical distortion of the material in size and shape.

The Commissioner of Internal Revenue determined that the respondent was subject to the profit-limiting provisions of the Vinson Act with respect to the materials which it furnished as above described and which immediately or mediately went into the construction of vessels or aircraft subject to the Vinson Act. Accordingly, the Commissioner determined a deficiency in the respondent's excess profits liability for the years 1936, 1937 and 1938. On petition by the respondent for a redetermination of the alleged liability, the Board of Tax Appeals held that the respondent was not subject to the profit-limiting provisions of the Vinson Act with respect to the business above described and entered decisions accordingly which are now before us for review on the Commissioner's petition.

It is not open to dispute that, under a relevant regulation of the Treasury Department (Art. 2 of T.D. 4723, Cum.Bull. 1937-1, pp. 519, 521),[2] the particular business, now under consideration, rendered the respondent liable for excess profits

2 Art. 2 of T.D. 4723 reads as follows: "Art. 2. Contracts and subcontracts under which excess profit liability may be incurred.—Except as otherwise provided with respect to contracts or subcontracts for certain scientific equipment (see article 3 of these regulations), every contract awarded for an amount exceeding $10,000 and entered into after the enactment of the Act of March 27, 1934, for the construction or manufacture of any complete naval vessel or aircraft, or any portion thereof, is subject to the provisions of the Act relating to excess profit liability. Any subcontract made with respect to such a contract and involving an amount in excess of $10,000 is also within the scope of the Act. If a contracting party places orders with another party, aggregating an amount in excess of $10,000, for articles or materials which constitute a part of the cost of performing the contract or subcontract, the placing of such orders shall constitute a subcontract within the scope of the Act, unless it is clearly shown that each of the orders involving $10,000 or less is a bona fide separate and distinct subcontract and not a subdivision made for the purpose of evading the provisions of the Act."

thereon as determined by the Vinson Act. The Board of Tax Appeals conceded as much but held that the Treasury regulation exceeded the scope of the Act and was therefore an unauthorized exercise of legislative power. The Board arrived at this result by concluding, upon a comparison of abstract dictionary definitions of "subcontractor" and "materialman", that the term "subcontractor", as used in the Vinson Act, could not have been intended to embrace mere suppliers of materials to prime contractors, notwithstanding that the contracts or orders for the materials, which the suppliers furnished, identified, as the place of intended use of such materials, particular naval or aircraft construction which was subject to the provisions of the Act. With that conclusion we are unable to agree.

■ It, of course, goes without saying that a Treasury regulation may not exceed the legislative intent of the Act which it purports to interpret for administrative purposes. If it does so offend, it is of no effect. See Helvering v. Sabine Transportation Co., 318 U.S. 306, 311, 312, 63 S.Ct. 569, 87 L.Ed. 773; Helvering v. Credit Alliance Corp., 316 U.S. 107, 113, 62 S.Ct. 989, 86 L.Ed. 1307. But, before such can be found to be the result, the primary question for decision is as to the intended scope of the cognate statute. Our immediate inquiry, therefore, is whether it was the intent of Congress that one who, although not a subcontractor in that he does not perform a definite part of a prime contract, nevertheless furnishes materials under contract or on orders from a prime contractor or subcontractor for designated use by the latter in the construction of vessels or aircraft covered by the Vinson Act, is also subject to the profit-limiting provision of that Act. We do not think this question is to be answered by arbitrarily ascribing to the word "subcontractor" a narrowly restricted and detached meaning. Once the purpose of the statute has been ascertained, the remaining inquiries are whether the evident legislative intent requires for its effectuation that the word "subcontractor" be construed as embracing a "materialman" and, if so, whether that may reasonably be done without doing violence to the words of the statute.

The profit-limiting provision of Sec. 3 of the Vinson Act, which was not a part of the bill (H.R. 6604) as originally introduced, was independently offered as an amendment on the floor of the House (Vol. 78 Cong. Record, Part 2, p. 1629) and, after some discussion, was accepted by Chairman Vinson of the Naval Affairs Committee who was in charge of the bill in the House (Ib. p. 1630). The amendment was the expression of a widely entertained desire on the part of members of Congress, oft expressed in both Houses during the passage of the bill, that excessive profits, such as had been derived from naval construction in times past, should be prevented.[3] While there was some opposition in Congress to the bill as a whole in its authorization of extensive naval construction,[4] we fail to find where a single voice was raised against the profit-limiting provision. Nor were any fine sights drawn by way of discrimination as to whose profits should or should not be so limited. The aim of the provision was to limit the profits on business done in connection with the naval construction provided for by the Act.

The amendment made in the House was very general and provided "* * * That no such appropriation shall be used for any contract with steel or aircraft or shipbuilding firms or corporations unless the said firm or corporation shall agree to limit its net profit on such Government contract to 10 percent of the gross of the contract." In the Senate, the House amendment was subjected to amendment. There, subcontracts were also included; subcontractors were to be required to agree to the conditions of the Vinson Act; and business in excess of $10,000, done in connection with naval construction subject to the provisions of the Act, was made a criterion of liability for excess profits. In the debate in the Senate on the final passage of the bill, Senator Trammell, who there had charge of the bill, said that "the very object and purpose of the principal amendment [relating to profit limitation] which the Sen-

---

[3] In the House, see Vol. 78 Cong. Record, Part 2, pp. 1605, 1606, 1616, 1617, 1623, 1633; in the Senate, ib., Part 3, pp. 2876, 2877; ib., Part 4, pp. 3477, 3492–3494, 3681, 3688–3692, 3780–3791, 3802 and 3805.

[4] The Vinson Act, as its title indicates (48 Stat. p. 503), was intended to authorize the up-building of the Navy within the limits allowed by the Washington and London Naval Treaties and provided for extensive naval construction at large estimated total cost.

ate committee has proposed" is "to limit the profits on construction authorized under this bill."[5] It was in conference between the two Houses that the profit-limiting provision, as finally enacted, was written. The Senate amendment was substantially· adopted by the conferees who also wrote in the specified procedure for the collection of excess profits.

We think there can be little room for doubt that the purpose of the profit limitation in the Vinson Act was to restrict to ten per cent the profit of anyone furnishing materials or service, worth $10,000 or more, for intended and designated use in naval construction authorized by the Act. The interpretation which the Board has placed upon the statute not only defeats that purpose in large part but, in so doing, it also works a serious discrimination against the Government as a builder of its own naval vessels. The Vinson Act provided that fifty per cent of the naval construction thereby authorized should be performed in Government yards. As to such work, where the Government is both the owner and builder of naval vessels, a supplier of materials for use in the Government's construction is automatically a prime contractor. In fact, the respondent in the instant case supplied the Government with materials for naval construction subject to the Vinson Act just the same as it supplied like materials to private builders under job contracts. Yet the respondent contends that the business which it thus did with private contractors was not subject to the profit limitation of the Vinson Act but, at the same time, concedes that the business which it did in supplying the Government was subject to the profit limitation. If the Act were so construed, it is readily apparent that the business incentive to suppliers of materials for naval construction would be to furnish private builders with as much as possible and the Government with as little as possible. Such an anomalous result is of course to be avoided, if possible, by a reasonable construction of the Act consistent with the legislative purpose and consonant with the expressed terms of the Act. United States v. Katz, 271 U.S. 354, 357, 46 S.Ct. 513, 70 L.Ed. 986; American Tobacco Co. v. Werckmeister, 207 U.S. 284, 293, 28 S.Ct. 72, 52 L.Ed. 208, 12 Ann.Cas. 595.

The evident legislative purpose of the provision can be effectuated fully and uniformly only if the word "subcontractor", as used therein, is construed to embrace anyone who, by contract or order, furnishes specified materials for intended and designated use in identified naval construction authorized by the Act. We think that it was the intent of Congress that the terms "subcontract" or "subcontractor", as used in the Vinson Act, should be so construed.

The Board of Tax Appeals was of the opinion that "Many state and other decisions make the distinction [between "materialmen and subcontractors"] plain". However, we do not find any such unanimity of pertinent decision that it may be said, as a matter of law, that, when the word "subcontractor" is used in a statute, it must perforce be taken to refer only to one who undertakes the performance of a separate portion or subdivision of a primary contract. In Clifford F. MacEvoy Co. et al. v. United States for Use, etc., 64 S.Ct. 890, 894, the Supreme Court, in construing the Miller Act, 49 Stat. 793, 40 U.S.C.A. § 270a, said that "Whether the word [subcontractor] includes laborers and materialmen is not subject to easy solution, for the word has no single, exact meaning." See also the footnote in support of the foregoing statement where it is said that "In analogous situations, state and lower federal courts have expressed divergent opinions as to whether the word 'subcontractor' includes laborers and materialmen" and cited the annotation in 141 A.L.R. 321 for a summary of the conflicting cases. Moreover, the same ·words, when used in different statutes, are to be read "in the light of the mischief to be corrected and the end to be attained" and may, therefore, call for varying interpretations. See South Chicago Coal & Dock Co. v. Bassett, 309 U.S. 251, 259, 60 S.Ct. 544, 549, 84 L.Ed. 732; Berwind-White Coal Mining Co. v. Rothensies, 3 Cir., 137 F.2d 60, 61.

Accordingly, the meaning of the words "subcontract" and "subcontractor" in any statute is to be determined, so far as may reasonably be done, so as to effectuate the indicated legislative intent. In the case of the Vinson Act, that means that suppliers of materials of requisite amount in value for use in specified naval construction authorized by the Act are subcontractors and, hence, subject to the profit limitation of that Act.

---

[5] See Vol. 78 Cong.Record, Part 4, p. 3802.

That construction accords with the interpretation which the Treasury has uniformly followed in its administration of the profit-limiting provision almost from the time of its first enactment. Thus, in 1935, in response to specific inquiries with respect to the scope of Sec. 3 of the Vinson Act, the Treasury ruled [6] that suppliers of materials to prime contractors, in excess of $10,000, for specified use in naval construction authorized by the Vinson Act, were themselves subject to the profit limitation of that Act. The substance of the rulings then made was later (1937) incorporated in Treasury Regulation T.D. 4723, which covers the facts of the instant case. It is our opinion that the regulation both competently and appropriately applied the legislative intent of the statute and that it is, therefore, valid.

In addition, the Treasury Regulation has received implied congressional approval. With the attention of Congress specifically drawn to the manner in which the Treasury was administering the profit-limiting provisions of the Vinson Act, Congress amended Sec. 3 of the Act without prescribing for the words "subcontract" or "subcontractor" the narrowly restricted meanings upon which the decision of the Board in the instant case was made to rest. Thus, when Congress was engaged in making a number of amendments, Act of June 25, 1936, 49 Stat. 1926, touching the excess profits provision of Sec. 3 of the Vinson Act, Admiral Bloch, then Judge Advocate General of the Navy, testified in substance before the Senate Committee on Naval Affairs, at a hearing on the proposed amendments, that suppliers to private contractors of materials for use in naval construction were subject to "the ten percent law" (i.e., the profit-limiting provision of the Vinson Act).[7] Yet, notably, Congress did not take any action either to offset or nullify the effect of the existing Treasury rulings.

The further legislative confirmation is both interesting and pertinent. Contemporaneously with the 1936 amendment of Sec. 3 of the Vinson Act, as above mentioned, Congress enacted the Merchant Marine Act, June 29, 1936, c. 858, 49 Stat. 1985, and incorporated therein, as Sec. 505(b), 46 U.S.C.A. § 1155(b), a similar profit-limiting provision. The regulations thereupon adopted by the Maritime Commission for the administration of that provision defined a subcontract as including any agreement with a contractor for the furnishing of any materials or goods or the rendering of any services directly for the construction of a complete vessel or portion thereof.[8] Several years later, in order to make the profit-limiting provision applicable to aircraft acquired by the Army, Congress incorporated in Sec. 14 of the Act of April 3, 1939, c. 35, 53 Stat. 560, 34 U.S.C.A. § 496, a provision similar to Sec. 3 of the Vinson Act; and the regulations promulgated by the Secretary of the Treasury, and approved by the Secretary of War for the administration of the profit-limiting provision in the Act of 1939, contained an interpretation similar to Art. 2 of T.D. 4723. See T.D. 4909, 1939-2 Cum.Bull. 422, Sec. 16.2. Furthermore, the same interpretation of the profit-limiting provision was also contained in new regulations, applicable to Navy contracts, which were promulgated about the same time by the Secretary of the Treasury and approved by the Secretary of the Navy. See T.D. 4609, 1939-2, Cum.Bull. 404, Sec. 17.3.

With the historical background as thus shown, we recur to the matter of Congress' knowledge as to how the profit-limiting provision was being administered in practice and what Congress did about it. At hearings in both the Senate and House in 1940 on a bill to expedite the national defense, witnesses ascribed profit limitation as a cause of delay in ship and aircraft construction, particularly as applied to "subcontractors who are supplying material" and as it affected "the delivery of materials."[9] With relevant knowledge on

---

[6] I.T. 2930, Cum.Bull., 1935-2, pp. 533, 534.

[7] See hearing before the Senate Committee on Naval Affairs, 74th Cong., 2nd Sess., on H.R. 5730 (the 1936 Amendment of the Vinson Act), p. 9.

[8] See Maritime Commission Regulations Prescribing Method of Determining Profit, Sec. 2.33; Code of Federal Regulations (Supp.1939) Title 46, Sec. 285.11(e).

[9] See House Hearings before Committee on Naval Affairs on Sundry Legislation Affecting the Naval Establishment, 76th Cong. 2d and 3rd Sess., testimony of H. Gerrish Smith, president of the National Council of American Shipbuilders, at pp. 3217, 3218, and of A. B. Homer, of Bethlehem Shipbuilding Company, at p. 3233.

the part of Congress thus plainly indicated and notwithstanding that Congress did then adopt, Act of June 28, 1940, c. 440, 54 Stat. 676, 50 U.S.C.A.Appendix § 1151 et seq., a number of new provisions designed to expedite the program for ship and aircraft construction, it did nothing to alter the existing law as to profit limitation or the manner in which it was being administered. On the other hand, the existing administrative interpretation of the profit-limiting provisions was again reaffirmed by regulations approved by the Secretaries of the Treasury, War and Navy. Sec. 26.3 of T.D. 500, 1940-2 Cum. Bull. p. 397.

Finally, upon enacting the original provision for the re-negotiation of contracts, Sixth Supplemental National Defense Appropriation Act, 1942, Public Law No. 528, 56 Stat. 226, 245, Congress incorporated therein (Sec. 403(b) (2) and (3), 50 U.S.C.A.Appendix § 1191(b) (2, 3) ) provisions as to profit limitation. Thereafter the construction given those provisions conformed with the interpretation theretofore given the earlier profit-limiting provisions.[10] Six months later the renegotiation provisions of Public Law No. 528 were amended by Sec. 801 of the Revenue Act of 1942, Public Law No. 753, 56 Stat. 798, 982, 26 U.S.C.A. Int.Rev.Acts. At hearings thereon before the Senate Committee on Finance, Mr. Patterson, Under Secretary of War, and Mr. Marbury of the War Department testified to the past administration of the profit-limiting provision of the Vinson Act and specifically called the Committee's attention to the uncertainty which had lately been injected into the administration of the profit-limiting provisions by the decision of the Board of Tax Appeals in this very case. Mr. Patterson and Mr. Marbury, both being of the opinion that O.P.A. restrictions furnished a sufficient safeguard against excessive profits on standard materials commercially available and fearing administrative difficulties because of the large number of suppliers subject to the profit limitations as administered, sug-

gested the inclusion of a definition in the Act so as to restrict the profit-limiting provisions to prime contractors and their subcontractors in the narrow technical sense of that term.[11] The Maritime Commission was reported as opposed to the suggested change and as favoring a continuation of the existing law and regulations. There was no suggestion, however, from anyone that the regulations transgressed the profit-limiting provisions of the various statutes or that they were otherwise invalid. On the contrary, the acknowledged need of legislative action if "subcontract" or "subcontractor" were to be given a narrower meaning was of itself implicit recognition that the existing regulations comported with the intent of the law as written.

In the face of the direct suggestion, as above indicated, that the profit-limiting provisions be restricted to prime contractors and their subcontractors Congress did not merely confirm the existing law and regulations by disregarding the suggestion. It affirmatively showed its approval of the past administration of the profit-limiting provisions by providing in Sec. 801(a) (5) of the Revenue Act of 1942 (56 Stat. p. 982) that—

"The term 'subcontract' means any purchase order or agreement to perform all or any part of the work, or to make or furnish any article, required for the performance of another contract or subcontract. The term 'article' includes any material, part, assembly, machinery, equipment, or other personal property."

The respondent argues that this provision was new and, therefore, was not a reënactment of existing law. That can be so only if the strict letter of the prior law is allowed to blot out its understood intent as theretofore executed. The definition of "subcontract" in Sec. 801 of the Act of 1942 was at least pointed confirmation of the Treasury's past interpretation of the profit limitations of the various Acts. Indeed, it would be hard to imagine

---

[10] See War Department, Price Adjustment Board, Principles, Policy, and Procedure to be Followed in Renegotiation (August 10, 1942), Subdivision III, printed in Senate Hearings before Committee on Finance, 77th Cong. 2d Sess. on Sec. 403 of Public Law No. 528, pp. 16, 19; also Memorandum, dated July 6, 1942, Office of the Under Secretary of the Navy, Procurement Legal

Division, "Subject: Definition of word 'subcontractor' as used in Section 403, Sixth Supplemental National Defense Act, 1942 (Public Law No. 528, 77th Congress, approved March 27, 1942)."

[11] See Senate Hearings before the Committee on Finance, 77th Cong. 2d Sess. on Public Law numbered 528, September 22, 1942, pp. 37–39, 48, 49.

a stronger case of implied congressional approval of administrative regulations. And the force of such confirmation, where it exists and is apposite, is of course well recognized. Cf. Helvering v. Griffiths, 318 U.S. 371, 395–397, 63 S.Ct. 636, 87 L.Ed. 843; Helvering v. R. J. Reynolds Tobacco Co., 306 U.S. 110, 116, 59 S.Ct. 423, 83 L. Ed. 536; Helvering v. Winmill, 305 U.S. 79, 83, 59 S.Ct. 45, 83 L.Ed. 52; United States v. Dakota-Montana Oil Co., 288 U. S. 459, 53 S.Ct. 435, 77 L.Ed. 893.

■ If it be suggested that, although Congress plainly stated in the Revenue Act of 1942 that the term "subcontract", as used in the profit-limiting provision, was meant to include suppliers of materials for use in designated construction subject to the limitation, it did not expressly reaffirm that such had been the legislative meaning of the term "subcontract" in the past, the answer is two-fold. First, it was unnecessary to do so when that had been the interpretation administratively given the profit-limiting provisions of the Vinson Act and other Acts. And, second, the profit-limiting provisions of the Vinson Act and the Merchant Marine Act had two years earlier, Sec. 401 of the Second Revenue Act of 1940, c. 757, 54 Stat. 974, 26 U. S.C.A. Int.Rev.Acts, been expressly suspended for the future because of the interposition of the new excess profits tax.

■ One further matter remains to be considered. The respondent contends that, even though it be held subject to the profit limitation of the Vinson Act with respect to the job contracts and orders here involved, its profits thereon should be computed on the basis of the "schedule cost" rather than the "original cost" of the materials which it used in the performance of such contracts and orders. "Schedule cost" is the fair market value of the materials which the respondent had on hand on the date the Vinson Act became effective.

The deficiency determinations for the years in question which the Board passed upon involved not only the profits on the business which the respondent did in performing the job contracts and orders but also the profits on the business which it did in supplying the Government directly with materials for use in naval construction authorized by the Vinson Act. As to the profits on its Government business the respondent conceded before the Board that it was subject to the profit-limiting provision of the Vinson Act but contended that such profits were to be computed on the "schedule cost" rather than the "original cost" of the materials used. The Board decided that question adversely to the respondent which did not file a petition for review.

While the Board's ruling in such regard applied to the respondent's profits on its prime contracts with the Government as to which the respondent was held subject to the limitation of the Vinson Act, the question also had a direct bearing on the Commissioner's deficiency determinations for the years in question which were then before the Board on the respondent's petition for redetermination. And the Board relevantly decided the question which the respondent now presses. The reason the Board did not specifically apply its ruling, as to costs, to a determination of the respondent's profits on the job contracts and orders was because, as to the latter, the Board held the respondent not subject to the profit limitation of the Vinson Act. We do not think that the question as to the ascertainment of cost for determining profit is an open one on the instant petitions for review. See LeTulle v. Scofield, 308 U.S. 415, 421, 422, 60 S.Ct. 313, 84 L. Ed. 355; Helvering v. Pfeiffer, 302 U.S. 247, 250, 251, 58 S.Ct. 159, 82 L.Ed. 231. The respondent, not having filed a petition for review, is not in position to assail, even in part, the grounds relevant to the decisions entered by the Board of Tax Appeals. Cf. Ryerson v. United States, 312 U.S. 405, 408, 61 S.Ct. 656, 85 L.Ed. 917.

The decisions of the Board of Tax Appeals are reversed and matter remanded for further proceedings in accordance with this opinion.