LIBERTY MUTUAL INSURANCE
COMPANY et al.

v.

Everett FRIEDMAN, etc., et al.

Civ. No. K-77-2045.

United States District Court,
D. Maryland.

Dec. 28, 1979.

* The scales at Hardy Road periodically fail to operate. Consequently, actual tonnage delivered exceeds these figures.

Kalvin M. Grove, Jeffrey S. Goldman, Michael R. Lewis and Fox & Grove, Chicago, Ill., Eugene A. Edgett, Jr., Baltimore, Md., and John K. Dane, Boston, Mass., for plaintiffs.

Barbara Allen Babcock, Asst. Atty. Gen., Barbara B. O'Malley, William Z. Elliott and Kenneth J. Barnes, Dept. of Justice, Washington, D. C., and Russell T. Baker, Jr., U. S. Atty., Baltimore, Md., for defendants.

FRANK A. KAUFMAN, District Judge.

Plaintiffs, three related insurance companies (Liberty),[1] seek a declaratory judgment defining their status under Executive Order 11246 (E.O. 11246)[2] and the regulations pro-

1. Liberty Mutual Insurance Co. (Liberty Mutual), Liberty Mutual Fire Insurance Co. (Liberty Fire), and Liberty Mutual Life Assurance Co. of Boston (Liberty Life) are each Massachusetts corporations with principal offices in Boston. They underwrite and sell insurance throughout the United States, and are related through common management. Liberty Life is owned 90% by Liberty Mutual and 10% by Liberty Fire. Liberty Life itself apparently has no employees. Plaintiffs are herein collectively referred to as Liberty.

2. E. O. 11246, 3 C.F.R. § 169 (1974), reprinted in 42 U.S.C. § 2000e note (1976), provides in relevant part:

Under and by virtue of the authority vested in me as President of the United States by the Constitution and statutes of the United States, it is ordered as follows:

PART I—NONDISCRIMINATION IN GOVERNMENT EMPLOYMENT [Superseded by Ex.Ord.No.11478, Aug. 8, 1969, 34 F.R. 12985]

PART II—NONDISCRIMINATION IN EMPLOYMENT BY GOVERNMENT CONTRACTORS AND SUBCONTRACTORS

SUBPART A—DUTIES OF THE SECRETARY OF LABOR

Sec. 201. The Secretary of Labor shall be responsible for the administration of Parts II and III of this Order and shall adopt such rules and regulations and issue such orders as he deems necessary and appropriate to achieve the purposes thereof.

SUBPART B—CONTRACTORS' AGREEMENTS

Sec. 202. Except in contracts exempted in accordance with Section 204 of this Order, all Government contracting agencies shall include in every Government contract hereafter entered into the following provisions:

"During the performance of this contract, the contractor agrees as follows:

"(1) The contractor will not discriminate against any employee or applicant for employment because of race, color, religion, sex, or national origin. The contractor will take affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to their race, color, religion, sex or national origin. Such action shall include, but not be limited to the following: employment, upgrading, demotion, or transfer; recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship. The contractor agrees to post in conspicuous places, available to employees and applicants for employment, notices to be provided by the contracting officer setting forth the provisions of this nondiscrimination clause.

"(2) The contractor will, in all solicitations or advertisements for employees placed by or

on behalf of the contractor, state that all qualified applicants will receive consideration *for employment without regard to race, color, religion, sex or national origin.*

"(3) The contractor will send to each labor union or representative of workers with which he has a collective bargaining agreement or other contract or understanding, a notice, to be provided by the agency contracting officer, advising the labor union or workers' representative of the contractor's commitments under Section 202 of Executive Order No. 11246 of September 24, 1965, and shall post copies of the notice in conspicuous places available to employees and applicants for employment.

"(4) The contractor will comply with all provisions of Executive Order No. 11246 of Sept. 24, 1965, and of the rules, regulations, and relevant orders of the Secretary of Labor.

"(5) The contractor will furnish all information and reports required by Executive Order No. 11246 of September 24, 1965, and by the rules, regulations, and orders of the Secretary of Labor, or pursuant thereto, and will permit access to his books, records, and accounts by the contracting agency and the Secretary of Labor for purposes of investigation to ascertain compliance with such rules, regulations, and orders.

"(6) In the event of the contractor's non-compliance with the nondiscrimination clauses of this contract or with any of such rules, regulations, or orders, this contract may be cancelled, terminated or suspended in whole or in part and the contractor may be declared ineligible for further Government contracts in accordance with procedures authorized in Executive Order No. 11246 of Sept. 24, 1965, and such other sanctions may be imposed and remedies invoked as provided in Executive Order No. 11246 of September 24, 1965, or by rule, regulation, or order of the Secretary of Labor, or as otherwise provided by law.

"(7) The contractor will include the provisions of Paragraphs (1) through (7) in every subcontract or purchase order unless exempted by rules, regulations, or orders of the Secretary of Labor issued pursuant to Section 204 of Executive Order No. 11246 of Sept. 24, 1965, so that such provisions will be binding upon each subcontractor or vendor. The contractor will take such action with respect to any subcontract or purchase order as the contracting agency may direct as a means of enforcing such provisions including sanctions for noncompliance: *Provided, however,* That in the event the contractor becomes involved in, or is threatened with, litigation with a subcontractor or vendor as a result of such direction by the contracting agency, the contractor may request the United States to enter into such litigation to protect the interests of the United States."

Sec. 203. (a) Each contractor having a contract containing the provisions prescribed in Section 202 shall file, and shall cause each of his subcontractors to file, Compliance Reports with the contracting agency or the Secretary of Labor as may be directed. Compliance Reports shall be filed within such times and shall contain such information as to the practices, policies, programs, and employment policies, programs, and employment statistics of the contractor and each subcontractor, *and shall be in such form, as the Secretary of Labor may prescribe.*

(b) Bidders or prospective contractors or subcontractors may be required to state whether they have participated in any previous contract subject to the provisions of this Order, or any preceding similar Executive order, and in that event to submit, on behalf of themselves and their proposed subcontractors, Compliance Reports prior to or as an initial part of their bid or negotiation of a contract.

\* \* \* \* \* \*

SUBPART C—POWERS AND DUTIES OF THE SECRETARY OF LABOR AND THE CONTRACTING AGENCIES

Sec. 205. Each contracting agency shall be primarily responsible for obtaining compliance with the rules, regulations, and orders of the Secretary of Labor with respect to contracts entered into by such agency or its contractors. All contracting agencies shall comply with the rules of the Secretary of Labor in discharging their primary responsibility for securing compliance with the provisions of contracts and otherwise with the terms of this Order and of the rules, regulations, and orders of the Secretary of Labor issued pursuant to this Order. They are directed to cooperate with the Secretary of Labor and to furnish the Secretary of Labor such information and assistance as he may require in the performance of his functions under this Order. They are further directed to appoint or designate, from among the agency's personnel, compliance officers. It shall be the duty of such officers to seek compliance with the objectives of this Order by conference, conciliation, mediation, or persuasion.

Sec. 206. (a) The Secretary of Labor may investigate the employment practices of any Government contractor or subcontractor, or initiate such investigation by the appropriate contracting agency, to determine whether or not the contractual provisions specified in Section 202 of this Order have been violated. Such investigation shall be conducted in accordance with the procedures established by the Secretary of Labor and the investigating agency shall report to the Secretary of Labor any action taken or recommended,

(b) The Secretary of Labor may receive and investigate or cause to be investigated

mulgated thereunder by the Department of Labor's Office of Federal Contract Compliance Programs.[3] Defendants (the Government) are federal government officials who have been assigned various responsibilities under the Executive Order.[4] That Order requires government contractors and subcontractors to establish affirmative action employment programs, to file with the Government certain reports regarding employment policies, and to submit to certain government inspections and examinations.

complaints by employees or prospective employees of a Government contractor or subcontractor which allege discrimination contrary to the contractual provisions specified in Section 202 of this Order. If this investigation is conducted for the Secretary of Labor by a contracting agency, that agency shall report to the Secretary what action has been taken or is recommended with regard to such complaints.

Sec. 207. The Secretary of Labor shall use his best efforts, directly and through contracting agencies, other interested Federal, State, and local agencies, contractors, and all other available instrumentalities to cause any labor union engaged in work under Government contracts or any agency referring workers or providing or supervising apprenticeship or training for or in the course of such work to cooperate in the implementation of the purposes of this Order. The Secretary of Labor shall, in appropriate cases, notify the Equal Employment Opportunity Commission, the Department of Justice, or other appropriate Federal agencies whenever it has reason to believe that the practices of any such labor organization or agency violate Title VI or Title VII of the Civil Rights Act of 1964 [sections 2000d to 2000d–4 of this title and this subchapter] or other provision of Federal law.

\* \* \* \* \* \*

PART III—NONDISCRIMINATION PROVISIONS IN FEDERALLY ASSISTED CONSTRUCTION CONTRACTS

\* \* \* \* \* \*

3. 41 C.F.R. § 60–1.1 et seq. (1977).

4. The Secretary of Labor is responsible for administering the equal employment opportunity program established by E.O. 11246 and for issuing implementing rules and regulations. E.O. 11246, § 201 (see n.2 supra ). The Secretary discharges his responsibilities through the Department of Labor's Office of Federal Contract Compliance Programs and has designated the Social Security Administration of what was known until recently as the Department of

Liberty underwrites workers' compensation insurance[5] for many companies who contract with the Government. Usually, such insurance provides blanket coverage for all employees of those companies regardless of whether the employees are performing work on one or more government contracts or subcontracts. Many employers are required to maintain workmen's compensation insurance under the laws of each and every state and also under certain federal regulations, although most of those employers are given the option of self-insuring.[6] None of

Health, Education and Welfare as one of the several "compliance agencies" responsible for monitoring and investigating charges against contractors, and imposing sanctions upon contractors who do not comply with the Executive Order. See E.O. 11246, subpart C. The Insurance Compliance Staff within the Social Security Administration is the compliance agency primarily responsible for monitoring compliance with E.O. 11246 by those employers in the insurance industry subject to that Order. Defendant Friedman is Chief of the Insurance Compliance Staff of the Social Security Administration.

5. Workers' compensation insurance is seemingly the same as workmen's compensation insurance.

6. Liberty, relying on Burlington Truck Lines v. United States, 371 U.S. 156, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962), contends that this Court should not consider federal procurement regulations which may require contractors to provide workers' compensation insurance because any reliance on such federal regulations is a post hoc rationalization of the agency determination which refers only to workers' compensation insurance required by state statutes. See also NLRB v. Metropolitan Life Ins. Co., 380 U.S. 438, 444, 85 S.Ct. 1061, 1064, 13 L.Ed.2d 951 (1965), quoting Burlington, supra at 168, 83 S.Ct. at 246: " '[C]ourts may not accept appellate counsel's post hoc rationalizations for agency action . . . .' " Assuming, arguendo only, that this Court may consider any references to federal regulations, the result herein is not thereby affected since all states require that workmen's compensation insurance be provided by certain employers or that those employers self-insure with regard to the same. Although federal regulations may in some instances strengthen those state requirements, the federal regulations do not create the requirement. Additionally, as discussed infra, E.O. 11246 is in fact grounded not only in civil rights purposes but in procurement needs, and mention or lack of mention of those procurement needs does not alter that fact or constitute a post hoc rationalization approach of the type disapproved of in Burlington.

the said insurance which Liberty has written during the time period involved in this case runs directly in favor of any federal governmental agency. In 1975, Liberty held one contract with a government agency, i. e., an automobile fleet policy for the Veterans Administration with an $18,000 annual premium. That policy was subsequently dropped. Liberty, prior to September 30, 1977, was a reinsurer under the Federal Employees Group Life Insurance Program.

On October 21, 1977, defendant Friedman notified Liberty that Liberty is a subcontractor within the meaning of E.O. 11246. Liberty disagreed, contending that an employer who is not a prime government contractor but who underwrites or insures risks of occupationally-connected injuries or provides workers' compensation insurance for the benefit of a prime government contractor is not a government subcontractor under E.O. 11246. This is a question of first impression. Liberty states, *inter alia*, that if the Government is not enjoined from subjecting Liberty to the requirements of E.O. 11246, Liberty will either have to spend in excess of $250,000 to implement the requirements of E.O. 11246 or risk and almost surely suffer lost business opportunities from noncompliance. Liberty seeks declaratory relief herein pursuant to the Federal Declaratory Judgment Act, as amended, 28 U.S.C. §§ 2201–02, which is applicable herein. Subject matter jurisdiction is present pursuant to 28 U.S.C. § 1331(a). The case has been submitted by the parties upon the following stipulated facts:

1. Liberty has provided workers' compensation insurance to the following government contractors: Avis Rent-a-Car, since 1962; International Business Machines, since 1923; Reynolds Metals Corporation, 1953–66, 1971–present; United Aircraft Corporation (presently known as United Technology), since 1936; Westinghouse Corporation, since 1948; Bechtel Corporation, 1968–74, for purposes of one non-government project only; Raytheon Company, since 1929; General Instrument, since 1965; International Multifood, since 1968; and International Telephone & Telegraph, terminated April 1, 1978.

2. Liberty has not in the past and does not presently underwrite or guarantee any bonds for the construction of any federal buildings or public works.

3. The coverage terms for the majority of workers' compensation policies furnished by Liberty to insureds are on a calendar year basis. Liberty does not sell, underwrite or otherwise furnish insurance for any corporation or other business entity for the purpose of insuring that corporation or business entity against occupationally-connected injuries of its employees incurred solely on government projects.

4. Federal government agencies permit employers with whom those agencies contract to self-insure their own risks of occupationally-connected injuries in accordance with federal procurement rules and regulations.

5. Liberty has never given a certificate of compliance relating to E.O. 11246 to any primary contractor or subcontractor of the Government, or to any government department, agency or instrumentality.[7]

6. Liberty has never signed a contract or subcontract which explicitly contains the provisions of paragraphs (1) through (7) of section 202 of E.O. 11246 or any reference thereto.

7. By letter dated October 21, 1977, defendant Friedman wrote to Frank L. Farwell, Chairman of the Board of Liberty Mutual Insurance Company and Liberty Mutual Fire Insurance Company and informed Liberty that the Insurance Compliance Staff had found Liberty to be a government subcontractor within the meaning of E.O. 11246 as amended. Pursuant to the terms of E.O. 11246, Mr. Friedman requested that Liberty have in existence by November 28, 1977 affirmative action plans for each of its establishments across the country; that the plan for Liberty's corporate headquarters in Boston, Massachusetts

---

**7.** *See* 41 C.F.R. Part 60 1.29

be submitted to defendant Friedman by December 19, 1977; and that Liberty's corporate headquarters be made available for an on-site review commencing on January 16, 1978.[8]

8. The Government subsequently agreed to refrain from taking any action pending the outcome of the instant litigation.

Pursuant to § 202(7) of E.O. 11246, federal government contractors are required to

8. The Insurance Compliance Staff's finding was based upon a determination letter addressed to defendant Friedman, dated October 6, 1977 and signed by Weldon Rougeau, Director of the Office of Federal Contract Compliance Programs. That letter stated in relevant part:
> The definition of Government contract includes insurance, 41 CFR 60–1.3(m). Insurance is a necessary element of doing business which enables a contractor to perform on the contract.
> All States of the United States have enacted Workers Compensation Laws (previously known as Workmen's Compensation) indemnifying employers for losses due to work connected injuries or diseases sustained by their employees. Employers, including Federal Government contractors, are obligated by a statute to purchase and provide workers compensation to protect their employees. As such, the furnishing of workers compensation insurance by an insurance company to a contractor is a service which is necessary to the performance of the latters [sic] Federal contract(s). Based upon available information, Liberty Mutual Insurance Company has sold existing Workers Compensation policies to a number of Federal Government contractors, insuring their employees, including those engaged in government contract work, against work connected injuries and diseases. These Federal contractors include: Avis Rent-a-Car; FMC Corporation, IBM, Raytheon Company, Reynolds Metals Corporation, Trans World Airlines, United Aircraft Corporation, Westinghouse Corporation, accordingly [sic] to the latest available information. Therefore, Liberty Mutual Insurance Company is a subcontractor within the meaning of 41 CFR 60–1.3(w).
> \* \* \* \* \* \*
> The OFCCP has reviewed all relevant materials provided on the parent/subsidiary relation of Liberty Mutual. It is the decision of OFCCP that Liberty Mutual and the named subsidiaries are subject to Executive Order 11246, as amended, and Revised Orders No. 4 and 14. Some of the factors that were considered in reaching our decision are: common ownership, common directors and/pr [sic] officers, defacto exercise of control, unity of personnel policies emanating from a

include in every subcontract or purchase order (unless exempted by rules of the Secretary of Labor) the anti-discrimination provisions of § 202 of E.O. 11246.[9] In addition, each contractor is required to "take such action with respect to any subcontract or purchase order as the contracting agency may direct as a means of enforcing such provisions including sanctions for noncompliance \* \* \*."[10] The relevant terms are defined at 41 C.F.R. § 60–1.3.[11]

common source and dependency of operations. All factors need not be present in each case and the weight given to any one of the factors will depend upon the facts of the particular case.

9. *See* § 202(1)–(6) of E.O. 11246.

10. E.O. 11246, § 202(7).

11. § 60–1.3 *Definitions.*
> \* \* \* \* \* \*
> "Contract" means any Government contract or any federally assisted construction contract.
> "Contracting agency" means any department, agency, establishment, or instrumentality in the Executive Branch of the Government, including any wholly owned Government corporation, which enters into contracts.
> "Contractor" means, unless otherwise indicated, a prime contractor or subcontractor.
> \* \* \* \* \* \*
> "Government contract" means any agreement or modification thereof between any contracting agency and any person for the furnishing of supplies or services or for the use of real or personal property, including lease arrangements. The term "services", as used in this section includes, but is not limited to the following services: Utility, construction, transportation, research, *insurance,* and fund depository. The term "Government contract" does not include (1) agreements in which the parties stand in the relationship of employer and employee, and (2) federally assisted construction contracts.
> \* \* \* \* \* \*
> "Prime contractor" means any person holding a contract and, for the purposes of Subpart B of this part, any person who has held a contract subject to the Order.
> \* \* \* \* \* \*
> "Subcontract" means any agreement or arrangement between a contractor and any person (in which the parties do not stand in the relationship of an employer and an employee):
> (1) For the furnishing of supplies or services or for the use of real or personal proper-

Liberty's complaint, as finally amended, sounds in five counts: (1) the determination by defendants that Liberty is a "subcontractor" is inconsistent with the definition of "subcontractor" in the regulations, (2) if Liberty is found to be a subcontractor, then the regulations containing said definitions are beyond and outside the scope of E.O. 11246 and are invalid, (3) if the regulations are not beyond and outside the scope of E.O. 11246, then that Order and the regulations thereunder are invalid because they were promulgated beyond and outside the requisite congressional delegation of authority, (4) if E.O. 11246 and the regulations are not invalid, their application to Liberty is an unconstitutional exercise of presidential power in violation of the Due Process Clause of the Fifth Amendment in that Liberty's relationship, if any, to or with the procurement needs of the Government is insufficient to subject Liberty lawfully to the requirements and penalties provided in E.O. 11246 and its regulations, and (5) the proposed on-site review of Liberty's employment practices and records pursuant to 41 C.F.R. § 60–1.43, if conducted without a warrant and without Liberty's consent, would be violative of the Fourth Amendment.

### Meaning of the Regulations

█ As stated *supra* at p. 700, Liberty has never signed a contract or subcontract which explicitly or by reference contains the relevant provisions of E.O. 11246. Liberty contends that since Liberty has never consented to the anti-discrimination provisions required by E.O. 11246, Liberty has not in any sense "contracted" into such an obligation and, therefore, is not and cannot be a subcontractor. Consent, however, is not relevant in the context of E.O. 11246.

In *United States v. New Orleans Public Service, Inc.* (NOPSI), 553 F.2d 459 (5th Cir. 1977), *vacated and remanded on other grounds*, 436 U.S. 942, 98 S.Ct. 2841, 56 L.Ed.2d 783 (1978), Judge Ainsworth addressed the issue of whether a public utility was a government contractor subject to E.O. 11246.[12] In that case, the defendant utility, operating under a city permit, had a monopoly over the sale of electricity in the area, and was required to provide service to any customer requesting gas or electricity. The utility sold substantial amounts of gas

ty, including lease arrangements, which, in whole or in part, is necessary to the performance of any one or more contracts; or

(2) Under which any portion of the contractor's obligation under any one or more contracts is performed, undertaken, or assumed.

"Subcontractor" means any person holding a subcontract and, for the purposes of Subpart B of this part, any person who has held a subcontract subject to the Order. The term "First-tier subcontractor" refers to a subcontractor holding a subcontract with a prime contractor.

\* \* \* \* \* \*

(Emphasis supplied).

**12.** In NOPSI, the Fifth Circuit held, *inter alia*, that enforcement of E.O. 11246, section 202(5) and the regulations issued pursuant thereto requiring that each government contractor "permit access during normal business hours to its premises for the purpose of conducting on-site compliance reviews \* \* \*," 41 C.F.R. § 60–1.43, would not constitute an unreasonable search and seizure in violation of the Fourth Amendment. 553 F.2d at 470–72. The Supreme Court unanimously vacated and remanded the judgment in NOPSI "for further consideration" in the light of *Marshall v. Barlow's*

*Inc.*, 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978). In *Barlow's*, the Supreme Court held that warrantless searches of business premises pursuant to section 8(a) of the Occupational Safety and Health Act of 1970, 29 U.S.C. § 657(a), were unconstitutional. The Supreme Court's opinion in *Barlow's* and the remand in NOPSI for reconsideration in light of *Barlow's* in no way affects the weight which should be accorded to that portion of Judge Ainsworth's opinion and the analysis therein concerning aspects of E.O. 11246 other than those involving on-site inspections. Nor does the subsequent action of the Fifth Circuit, 577 F.2d 1030 (5th Cir. 1978), vacating the judgment of the District Court and remanding the case for further consideration in light of the Supreme Court's order, weaken the analysis of E.O. 11246 set forth by Judge Ainsworth.

On November 16, 1979, Judge Cassibry filed his opinion on remand in NOPSI holding E.O. 11246 and the regulations promulgated pursuant to it non-violative of the Fourth Amendment under the standards enunciated by the Supreme Court in *Barlow's*. *United States v. New Orleans Public Service, Inc.*, 480 F.Supp. 705 (E.D.La.1979).

and electricity to federal agencies in the area. It was for that reason that the utility was called upon by the Secretary of Labor to comply with the anti-discrimination provisions of E.O. 11246. The utility contested the applicability of that Order, arguing, in part, that it had never contractually consented to the provisions of the Order, that it had indeed refused to accept that Order's affirmative action obligations, and that, in addition, since it supplied energy pursuant to its local franchise which required that it provide power to all customers requesting the same, it could not be viewed as voluntarily consenting to any contract with any federal government agency. Rejecting that contention, the Fifth Circuit held that the Order was applicable to government contractors such as NOPSI regardless of the absence or presence of contractual consent to its anti-discrimination provisions.

The regulations themselves, 41 C.F.R. § 60–1.4(e), provide:

> *Incorporation by operation of the Order.* By operation of the Order, the equal opportunity clause shall be considered to be a part of every contract and subcontract required by the Order and the regulations in this part to include such a clause whether or not it is physically incorporated in such contracts and whether or not the contract between the agency and the contractor is written.

Judge Ainsworth (at 465) held the regulations to be within the scope of E.O. 11246, writing:

> Furthermore, the appropriate measure of the regulation's validity is whether it was within the scope of the Executive Order. *See Contractors Ass'n, supra,* 442 F.2d at 175. In deciding that question, we give special deference to the Labor Department's interpretation of the Order which that department was charged to administer. *Id.; see Udall v. Tallman,* 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); *cf. Griggs v. Duke Power Co.,* 401 U.S. 424, 433–34, 91 S.Ct. 849, 854–55, 28 L.Ed.2d 158 (1971); *Power Reactor Dev. Co. v. International Union of Elec., Radio & Mach. Workers,* 367 U.S. 396, 408, 81

S.Ct. 1529, 1535, 6 L.Ed.2d 924 (1961). The Executive Order specifically authorized the issuance of implementing regulations by the Secretary of Labor, and the disputed provision, 41 C.F.R. § 60–1.4(e), did nothing more than give teeth to the mandate of the Order. The regulation was thus within the scope of the presidential directive in so implementing it.

As was true as to *NOPSI,* Liberty's consent or non-consent is irrelevant. What matters is whether Liberty is or is not a subcontractor within the meaning of E.O. 11246.

 The "definitions" section (41 C.F.R. § 60–1.3) of the regulations provides that a "subcontract" is an agreement or arrangement between a contractor and any person "[f]or the furnishing of supplies or services or for the use of real or personal property, including lease arrangements, which, in whole or in part, is *necessary* to the performance of any one or more contracts * * *. (Emphasis supplied). Liberty asserts that while certain state laws and federal regulations may require employers to provide their employees with workmen's compensation coverage and while such coverage may therefore be a *necessary* predicate to the undertaking and completion of work under federal contracts, it is not necessary that the insurance be furnished by an outside source, such as Liberty, because state laws and federal regulations permit contractors to self-insure. That argument reduces itself to the contention that the word "necessary" modifies only the "furnishing" and not the "supplies or services" themselves. The word "necessary" is preceded by the verb "is." The latter, being in the singular, would, if it is used with grammatical propriety, refer to "furnishing" and not to "supplies or services" since the latter connote the plural. But there is no grammatical problem if the words "is" and "necessary" refer to the entire phrase, "the furnishing of supplies or services," and to the total meaning of the same. Those in charge of compliance with E.O. 11246 and the regulations have ascribed that interpretation to the use of the

word "subcontractor" in section 60–1.3. That interpretation is entitled to great deference, particularly when it is consistent with the purposes for which the regulation was promulgated and the purposes of the underlying statutes and executive order by which the regulation was authorized.[13] That does not mean that the deference given to an administrative agency's interpretation of its own regulation authorizes an agency to issue a regulation in excess of its authority.[14] But such deference does impose upon a person challenging such interpretation the burden of establishing a lack of rational basis for an administrative agency's interpretation of its own regulation.[15] Liberty's argument at best is based upon one possible literal grammatical reading of the grammar and syntax of Definition 60–1.3. That reading, however, hardly comports with the purpose of the regulations, because if "necessary" modifies only "furnishing," a third-party contractor would seldom constitute a "subcontractor." Primary contractors engage "subcontractors" to provide supplies or services, for economic or other reasons. It is a rare instance in which a primary contractor has no choice but to engage the services of a subcontractor. Liberty's argument appears to mean that a person is a subcontractor under section 60–1.3 only if the primary contractor is required by law or by business necessity or some other factor to enter into a subcontract with such person. Such a narrow interpretation hardly comports with the purposes of E.O. 11246 and the regulations. Accordingly, Liberty's imaginative, linguistic argument may not prevail.

In *MacEvoy v. United States*, 322 U.S. 102, 106–10, 64 S.Ct. 890, 893, 894, 88 L.Ed. 1163 (1944), the Supreme Court, in defining "subcontractor" as it appears in the Miller Act,[16] wrote:

\* \* \* Section 1(a)(2) of the Miller Act requires every Government contractor, where the amount of the contract exceeds $2,000, to furnish to the United States a payment bond with a surety "for the protection of all persons supplying labor and material in the prosecution of the work provided for in said contract for the use of each such person." Section 2(a) further provides that "every person who has furnished labor or material in the prosecution of the work provided for in such contract" and who has not been paid in full therefor within ninety days after the last labor was performed or material supplied may bring suit on the payment bond for the unpaid balance. A proviso then states:

"Provided, however, That any person having direct contractual relationship with a subcontractor but no contractual relationship express or implied with the contractor furnishing said payment bond shall have a right of action upon the said payment bond upon giving written notice to said contractor within ninety days from the date on which such person did or performed the last of the labor or furnished or supplied the last of the material for which such claim is made. \* \* \* "

\* \* \* \* \* \*

The proviso of Section 2(a), which had no counterpart in the Heard Act, makes clear that the right to bring suit on a payment bond is limited to (1) those materialmen, laborers and subcontractors who deal directly with the prime contractor and (2) those materialmen, laborers and sub-contractors who, lacking express or implied contractual relationship with the prime contractor, have direct contrac-

---

**13.** *See, e. g., Griggs v. Duke Power Co.*, 401 U.S. 424, 434, 91 S.Ct. 849, 855, 28 L.Ed.2d 158 (1971), and cases cited thereat; *NOPSI, supra* at 465; *Rossetti Contracting Co., Inc. v. Brennan*, 508 F.2d 1039, 1042 (7th Cir. 1975); *Contractors Ass'n of E. Pa. v. Secretary of Labor*, 311 F.Supp. 1002, 1009 (E.D.Pa.1970), *aff'd*, 442 F.2d 159, 175 (3d Cir.), *cert. denied*, 404 U.S. 854, 92 S.Ct. 98, 30 L.Ed.2d 95 (1971).

**14.** *See, e. g., Peters v. Hobby*, 349 U.S. 331, 345, 75 S.Ct. 790, 797, 99 L.Ed.1129 (1955); *U. S. v. Abrams*, 197 F.2d 803, 805 (6th Cir.), *cert. denied*, 344 U.S. 855, 73 S.Ct. 93, 97 L.Ed. 664 (1952).

**15.** *See* cases cited in n.13 *supra*.

**16.** 40 U.S.C. § 270a, *et seq.*

tual relationship with a subcontractor and who give the statutory notice of their claims to the prime contractor. To allow those in more remote relationships to recover on the bond would be contrary to the clear language of the proviso and to the expressed will of the framers of the Act. Moreover, it would lead to the absurd result of requiring notice from persons in direct contractual relationship with a subcontractor but not from more remote claimants.

The ultimate question in this case, therefore, is whether Miller, the materialman to whom Tomkins sold the goods and who in turn supplied them to MacEvoy, was a subcontractor within the meaning of the proviso. If he was, Tomkins' direct contractual relationship with him enables Tomkins to recover on MacEvoy's payment bond. If Miller was not a subcontractor, Tomkins stands in too remote a relationship to secure the benefits of the bond.

The Miller Act itself makes no attempt to define the word "subcontractor." We are thus forced to utilize ordinary judicial tools of definition. Whether the word includes laborers and materialmen is not subject to easy solution, for the word has no single, exact meaning. In a broad, generic sense a subcontractor includes anyone who has a contract to furnish labor or material to the prime contractor. In that sense Miller was a subcontractor. But under the more technical meaning, as established by usage in the building trades, a subcontractor is one who performs for and takes from the prime contractor a specific part of the labor or material requirements of the original contract, thus excluding ordinary laborers and materialmen. To determine which meaning Congress attached to the word in the Miller Act, we must look to the Congressional history of the statute as well as to the practical considerations underlying the Act. [Footnotes omitted.]
Thus, the Supreme Court in *MacEvoy* defined "subcontractor," for purposes of the Miller Act, in the light of that statute's purpose, and specifically limited (at 109–11, 64 S.Ct. at 894–95) its definition to the Miller Act context.

In *Commissioner of Internal Revenue v. Aluminum Co.*, 142 F.2d 663, 668 (3d Cir.), *cert. denied*, 323 U.S. 728, 65 S.Ct. 64, 89 L.Ed. 585 (1944), the Third Circuit defined "subcontractor," as that term is used in the profit limitations provisions of the Vinson Act,[17] as embracing "anyone who, by contract * * *, furnishes specified materials for intended and designated use in identified naval constructions," and in so doing stated:

Accordingly, the meaning of the words "subcontract" and "subcontractor" in any statute is to be determined, so far as may reasonably be done, so as to effectuate the indicated legislative intent. In the case of the Vinson Act, that means that suppliers of materials of requisite amount in value for use in specified naval construction authorized by the Act are subcontractors and, hence, subject to the profit limitation of that Act.

In *F. D. Rich Co., Inc. v. Industrial Lumber Co.*, 417 U.S. 116, 94 S.Ct. 2157, 40 L.Ed.2d 703 (1974), Mr. Justice Marshall wrote as follows concerning the Miller Act (at 123–24, 94 S.Ct. at 2162):

The Court of Appeals properly construed our holding in *MacEvoy* to establish as a test for whether one is a subcontractor, the substantiality and importance of his relationship with the prime contractor. It is the substantiality of the relationship which will usually determine whether the prime contractor can protect himself, since he can easily require bond security or other protection from those few "subcontractors" with whom he has a substantial relationship in the performance of the contract. [Footnote omitted.]
The Court in *Rich* held that a relationship of prime contractor and subcontractor existed between the two companies involved, noting (at 124, 94 S.Ct. at 2162) the "total relationship" between them, including other

17. 34 U.S.C. § 496.

contracts and the interrelation of management.

In *Aetna Casualty & Surety Co. v. United States ex rel. Gibson Steel Co.*, 382 F.2d 615 (5th Cir. 1967), the Fifth Circuit held that a company which furnished custom-built items to a prime government contractor was a materialman rather than a subcontractor, under the Miller Act. Judge Wisdom read *MacEvoy* to pin the distinction between a "subcontractor" and a "materialman" on "the substantiality and importance of the relationship between the middle party and the prime contractor." 382 F.2d at 617. He noted that, in *Aetna*, the party involved supplied relatively simple prefabricated items, furnished no performance bond to the prime government contractor, did no on-site work other than installation of the items supplied, and performed work under a contract which "amounted roughly only to two percent of the total construction cost." *Id.* at 618.

In *United States ex rel. Bryant v. Lembke Construction Co.*, 370 F.2d 293 (10th Cir. 1966), another Miller Act case, the Tenth Circuit held that a supplier of concrete to the prime contractor on a government construction contract was a materialman rather than a subcontractor. The Court based its determination on "a consideration of the extent to which, in matters of substance, the prime contractor delegates to the supplier, and the supplier undertakes to perform for the prime subcontractor, a specific part of the labor or material requirements of the prime contract." 370 F.2d at 295 (footnote omitted).

In *Miller Equipment Co. v. Colonial Steel & Iron Co.*, 383 F.2d 669 (4th Cir. 1967), *cert. denied*, 390 U.S. 955, 88 S.Ct. 1049, 19 L.Ed.2d 1148 (1968), the government contract required the prime contractor to fabricate and deliver structural steel to be incorporated into a federal bridge project. The Fourth Circuit held that the steel supplier was a subcontractor under the Miller Act. In so holding, Judge Bryan concluded that,

although the agreement was labelled a "purchase order," the amount due to the steel supplier was more than 15% of the total contract and 64% of the amount due under a "fundamental provision" of the prime contract. Judge Bryan also noted that the contract called for custom fabrication of steel and not just mere supply of materials. *Id.* at 674.[18]

A number of other statutes and regulations provide definitions of the word "subcontractor." Thus, for example, 41 U.S.C. § 52, relating to kickbacks by subcontractors in government Miller projects, provides:

> For the purpose of sections 51–54 of this title, the term "subcontractor" is defined as any person, including a corporation, partnership, or business association of any kind, who holds an agreement or purchase order to perform all or any part of the work or to make or to furnish any article or service required for the performance of a negotiated contract or of a subcontract entered into thereunder; the term "person" shall include any subcontractor, corporation, association, trust, joint-stock company, partnership, or individual; and the term "negotiated contract" means made without formal advertising.

41 U.S.C. § 103, dealing with war contracts, states:

> As used in this chapter—
>
> (a) The term "prime contract" means any contract, agreement, or purchase order heretofore or hereafter entered into by a contracting agency and connected with or related to the prosecution of the war; and the term "prime contractor" means any holder of one or more prime contracts.
>
> (b) The term "subcontract" means any contract, agreement, or purchase order heretofore or hereafter entered into to perform any work, or to make or furnish any material to the extent that such work or material is required for the performance of any one or more prime contracts

---

18. *See also Travelers Indemnity Co. v. United States ex rel. Western Steel Co.*, 362 F.2d 896 (9th Cir. 1966), and *Basich Bros. Construction Co. v. United States ex rel. Turner*, 159 F.2d 182 (9th Cir. 1946), holding the party in question to be a Miller Act subcontractor.

or of any one or more other subcontracts; and the term "subcontractor" means any holder of one or more subcontracts.

The regulations relating to termination and settlement of government contracts, set forth in 41 C.F.R. § 1–8101(v), provide:

"Subcontract" means any contract, as defined in § 1–1.208, other than a prime contract, entered into by a prime contractor or a subcontractor, calling for supplies or services required for the performance of any one or more prime contracts.

While the Miller Act cases and other statutory provisions are generally instructive as to the meaning of the word "subcontractor" as used in E.O. 11246, they are not controlling in this case. As observed by the Third Circuit in *Commissioner of Internal Revenue v. Aluminum Co., supra,* 142 F.2d at 668: "Moreover, the same words, when used in different statutes, are to be read 'in the light of the mischief to be corrected and the end to be attained' and may therefore, call for varying interpretations. [Citations omitted]." Someone who is a "materialman" rather than a "subcontractor" for purposes of the Miller Act may or may not be a subcontractor for the civil rights and/or procurement purposes of E.O. 11246.

In this case, the intent to include insurers within the class of subcontractors is clearly manifest in the definitions themselves—subcontractors include those who provide services or supplies, 41 C.F.R. § 60–1.3 (the "generic definition" of subcontractor discussed in *MacEvoy, supra*), and the term services unambiguously includes insurance. 41 C.F.R. § 60–1.3.

Liberty may well not be a Miller Act subcontractor, as *MacEvoy* and its progeny have interpreted that word under that Act, in situations in which the prime contract calls for the construction of a project or for the furnishing of supplies and services other than insurance. The insurance component in terms of dollars is usually not a predominant one in connection with performance by the prime contractor. Nor does the prime contractor delegate a major responsibility to the insurance carrier. But 41 C.F.R. § 60–1.3, by its own words, is much more inclusive in the formulation of its definition of a subcontractor than the interpretation which has been accorded that word in a Miller Act context by *MacEvoy* and its progeny. And E.O. 11246 and the regulations which implement it have broad remedial societal purposes. In that light, it is important that Liberty does indeed furnish something—i. e., compensation insurance—which is "necessary" for the performance of government contracts by the prime contractors Liberty insures.

Liberty stresses that its workmen's compensation policies are usually issued on an annual basis and are not related to any particular government contract or to government contracts in general, and that most, if not all, government contractors probably purchased such insurance coverage from Liberty without contemplation at the time of such purchase of entering into any particular government contract. Liberty also notes that none of the workmen's compensation policies written for government contractors incorporates the equal opportunity language of E.O. 11246, even though pursuant to section 202(7) of E.O. 11246, all government contractors are required to incorporate such provision in "every subcontract or purchase order." Thus, it is arguable that government contractors do not consider their workmen's compensation insurance policies to be subcontracts. However, that does not mean that the purchase of such policies is not "necessary" in order to permit a government contractor to perform its obligations under its government contract or that the insurance purchase is not a subcontract.

It is true that some subcontractors in service industries other than insurance may perform functions more closely related to the particular government contracts of the primary contractors than does an insurance carrier such as Liberty. But those charged with administering E.O. 11246 have, in fact, given a very broad construction to the word "subcontractor" in the affirmative action area. Thus, for example, the following have been deemed to be "subcontractors" for that purpose: (1) a research laboratory

which develops weapon models and conducts metal stress tests for companies holding government defense contracts with the Department of Defense; (2) a company which provides security services and transfers funds for government contractors; (3) a company which provides training films and other materials and services used to meet the affirmative action requirements imposed on all government contractors; (4) a title insurance company which conducts title searches for building or public work contractors and demographic analyses of geographic areas and preparation of reports for site locations of government buildings; (5) a company which assembles computers and trains programmers to facilitate the performance of government contracts; (6) a company which obtains mortgages and commercial loans necessary to enable the prime contractor to have the financing needed to perform its government contract. In the area of insurance, the Government has similarly treated companies which serve as the legal representative of the buyer and/or seller in negotiating a binding contract for the purchase or sale of insurance, and companies employed by prime contractors either to assess the need for or to provide comprehensive insurance coverage packages to enable such prime contractors to meet government-specified levels of insurance coverage.

■■■■ E.O. 11246 is a remedial civil rights measure which has been and should be broadly construed.[19] As discussed *supra* at p. 703, a government agency's own interpretation of an Executive Order is owed great deference. In order to sustain an agency's construction of a statutory term, a court "need not find that its construction is the only reasonable one, or even that it is the result we would have reached had the question arisen in the first instance in judicial proceedings." *Unemployment Compensation Comm'n v. Aragon*, 329 U.S. 143, 153,

67 S.Ct. 245, 250, 91 L.Ed. 136 (1946). As long as the agency's interpretation is "reasonably related to the purposes of the enabling legislation," *Thorpe v. Housing Authority of Durham*, 393 U.S. 268, 280–81, 89 S.Ct. 518, 525, 21 L.Ed.2d 474 (1969), the agency's action is to be affirmed. Those tests are met herein. Accordingly, the Government's interpretation herein of the word "subcontractor" controls.

### Validity of the Regulations

The history and development of E.O. 11246 is set forth in exhaustive detail in *Contractors Ass'n of Eastern Pa. v. Secretary of Labor*, 442 F.2d 159, 168–74 (3d Cir.), *cert. denied*, 404 U.S. 854, 92 S.Ct. 98, 30 L.Ed.2d 95 (1971), and in *NOPSI, supra*, 553 F.2d 459.[20] In *NOPSI*, Judge Ainsworth wrote (at 465–68):

As indicated earlier, the first strand of NOPSI's argument—namely, the contention that the Government acted without authority in this case—has to do with executive power. Yet that contention ignores the fact of a long-entrenched government program, set in motion and continually kept alive by a series of presidents and approved by Congress. The Executive Order program prohibiting employment discrimination by government contractors has been in effect since World War II. President Franklin D. Roosevelt issued the first such Executive Order, and each of his successors has followed suit. *See Contractors Ass'n, supra*, 442 F.2d at 168–71.

Roosevelt's initial prohibition, Executive Order 8802, 3 C.F.R. 957 (1938–1943 Compilation), required a nondiscrimination clause in all defense contracts. Pursuant to a subsequent statute intended to expedite the war effort, Roosevelt issued Executive Order 9001, 3 C.F.R. 1054 (Compilation 1938–1943), which stated that a nondiscrimination clause would be deemed incorporated by reference in all

---

**19.** In *MacEvoy* (322 U.S. at 107, 64 S.Ct. at 893), before discussing the specific language of the Miller Act, Mr. Justice Murphy characterized that Act as "highly remedial in nature." But what is required by the remedial purposes

of the Miller Act is not necessarily what is required by the remedial purposes of E.O. 11246.

**20.** *See* n. 12 *supra*.

defense contracts covered by the statute. Executive Order 9346, 3 C.F.R. 1280 (1938–1943 Compilation), issued in 1943, required the inclusion of a nondiscrimination clause in all government contracts, not just in defense contracts. However, that Order was still based upon the President's war mobilization powers. *Contractors Ass'n, supra,* 442 F.2d at 169. Executive Orders 8002 and 9346 were continued by President Truman in 1945. Exec. Order No. 9664, 3 C.F.R. 480 (1943–1948 Compilation). Six years later, the President signed an order continuing the provision that a nondiscrimination clause would be deemed incorporated by reference in all defense contracts, Exec. Order No. 10210, 3 C.F.R. 390 (1949–1953 Compilation), and the President, still acting under his war powers, issued another series of Executive Orders extending Executive Order 10210 to additional government agencies, other than the Department of Defense, engaged in defense-related procurement. *Contractors Ass'n, supra,* 442 F.2d at 169. President Eisenhower issued Executive Orders which broadened the contract compliance program, and, significantly, those orders were not issued pursuant to the President's power over defense production. *Id.* at 170. In 1961, President Kennedy issued Executive Order 10925, 3 C.F.R. 448 (1959–1963 Compilation), inserting "affirmative action" language in a nondiscrimination clause required in all government contracts. And President Johnson in 1965 issued Executive Order 11246, transferring to the Secretary of Labor certain compliance functions previously vested in the President's Committee on Equal Employment Opportunity, and continuing the affirmative action requirement.

Although the Labor Department's federal contract compliance program originated by Executive Order, rather than by legislation, Congress has considered the program on several occasions. At the least, there has been implied congressional approval of the program; it can even be argued that there has been express ratification. The Government correctly identifies three sources of legislative authorization for the Executive Order.

First, the President has express authority over direct federal procurement practices, under 40 U.S.C. § 486(a). While some presidents acted pursuant to their war powers in promulgating Executive Orders concerning employment discrimination by government contractors, the President's broad statutory procurement power has been held to be authorization for other Executive Orders which were not related to war production. *See Contractors Ass'n, supra,* 442 F.2d at 169–71; *Farkas, supra,* 375 F.2d at 632 n.1. Furthermore, more recent decisions involving Executive Order 11246 have candidly acknowledged the validity of the use by the President or Congress of the procurement process to achieve social and economic objectives. *See Rossetti Contracting Co. v. Brennan,* 7 Cir. 1975, 508 F.2d 1039, 1045 n.18; *Northeast Const. Co. v. Romney,* 1973, 157 U.S.App.D.C. 381, 485 F.2d 752, 760. Those cases stand for the proposition that equal employment goals themselves, reflecting important national policies, validate the use of the procurement power in the context of the Order.

The second source of legislative authorization is Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* A reference in the Act, as originally enacted, *id.* § 2000e–8(d), to the Executive Order program indicated congressional intent that the program would continue in existence. *See Contractors Ass'n, supra,* 442 F.2d at 171. This reading of congressional intent is further supported by the decision of Congress at that time not to make Title VII the exclusive federal remedy in this area. *See* 110 Cong. Rec. 13650–52 (1964); *Alexander v. Gardner-Denver Co.,* 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974); *Sanders v. Dobbs Houses, Inc.,* 5 Cir., 1970, 431 F.2d 1097, *cert. denied,* 401 U.S. 948, 91 S.Ct. 935, 28 L.Ed.2d 231 (1971).

Third, the debates surrounding the Equal Employment Opportunity Act of

1972, Pub.Law No. 92–261, 86 Stat. 103, which amended Title VII, offer additional evidence of congressional approval. For example, legislative sentiment in support of the Executive Order program surfaced in successful opposition to a renewed attempt to make Title VII the exclusive federal remedy. *See* 118 Cong.Rec. 3371–73 (1972) (remarks of Senator Williams); *id.* at 3962, 3964 (remarks of Senator Javits). Additional support can be inferred from the defeat of a proposal to transfer the program to the Equal Employment Opportunity Commission. *See id.* at 1387–98. Other aspects of the Act which were enacted into law illustrate congressional contemplation of the program's continuance. *See, e. g.,* 42 U.S.C. §§ 2000e–14, 2000e–17. To be sure, the legislative history does not show, in so, many words, congressional ratification of the particular aspect of the Executive Order program here at issue, *viz.,* the imposition by operation of the Order of the nondiscrimination clause on all government contractors, regardless of whether the employers have expressly consented to the clause. However, Congress not only has refused to circumscribe the role of the Office of Federal Contract Compliance in combating employment discrimination, but has indicated a concern for the efficacy of such efforts and an intent that they would continue. The regulation in controversy is an integral part of a long-standing program which Congress has recognized and approved. We have no difficulty, therefore, in finding congressional authorization for the provision.[8] It follows that the application

[8] NOPSI argues that application of the Executive Order herein contravenes the principle in *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952), in which the Supreme Court held that President Truman's seizure of the steel mills was unlawful. In *Youngstown,* however, Congress had refused to authorize governmental seizure of property as was therein attempted. Therefore, the President had acted in the face of that congressional decision and in the absence of any other power authorizing his action. *See* 343 U.S. at 585–89, 72 S.Ct. at 866–67. The instant case is thus distinguishable, since the Executive acted here pursuant to congression-

al authorization. The application of the Order today before us falls within the first category of executive power—that of maximum power—which Justice Jackson identified in his concurring opinion in *Youngstown,* 343 U.S. at 635–37, 72 S.Ct. at 870–71; *see Contractors Ass'n, supra,* 442 F.2d at 168–71. Furthermore, the analogy to a seizure is manifestly imprecise.

At oral argument, NOPSI also cited *NAACP v. FPC,* 425 U.S. 662, 96 S.Ct. 1806, 48 L.Ed.2d 284 (1976), in which the Supreme Court held that the Federal Power Commission did not have authority under the Federal Power Act and the Natural Gas Act to issue a rule prohibiting discriminatory employment practices by the agency's regulatees. However, *FPC* does not aid appellant's position. The opinion does not hold that an agency cannot issue regulations concerning affirmative action, assuming the agency has a statutory basis for doing so, nor does it suggest that issuance of such regulations is prohibited unless Congress has authorized the agency to promulgate them. Furthermore, the Court did hold that the FPC indirectly could regulate discriminatory employment practices by its regulatees, to the extent that such practices demonstrably affected a regulatee company's labor costs. *Id.* 425 U.S. at 666–670, 96 S.Ct. at 1810–11. Therefore, under *FPC,* a government agency can regulate discriminatory employment practices to the extent that such discrimination is related directly to the agency's functions. That principle should be read in light of *Rosetti Contracting* and *Northeast Constr.,* which involve the Executive Order herein and require only a loose relationship between the noneconomic objective, *i. e.,* regulating employment discrimination, and the procurement function. *Rosetti Contracting, supra,* 508 F.2d at 1045 n.18; *Northeast Constr., supra,* 485 F.2d at 760–61. We also note Mississippi Power & Light's citation of *Hampton v. Mow Sun Wong,* 426 U.S. 88, 96 S.Ct. 1895, 48 L.Ed.2d 495 (1976), apparently to rebut the proposition that Congress ratifies executive orders by subsequently recognizing their existence and making reference to them. However, to the extent that the Supreme Court addressed this issue in *Mow Sun Wong,* the opinion turned on the particular facts in controversy. That case involved, *inter alia,* the question whether acquiescence by the Executive and Congress in a Civil Service Commission policy imposing a citizenship requirement on federal employees was sufficient to give the Commission rule the same support as an express statutory or presidential command. The Court held that neither appropriations acts nor executive orders in which Congress and the President, respectively, had considered the policy and spoken to it in some fashion could fairly be read as evidencing either approval or disapproval of the policy by either branch. *Id.* 426 U.S. at 104–114, 96 S.Ct. at 1906–10. The opinion makes

clear, though, that the legislative history and executive orders there in dispute could arguably be taken either way, i. e., they might be read as evidencing either disapproval or approval, and it was that ambiguity which gave rise to the Court's statement. Thus, *Mow Sun Wong* is clearly distinguishable from the case at bar. The legislative history behind the program today before us lacks such ambiguity as dictated the *Mow Sun Wong* result. Furthermore, the cited case lacked the clear directive from the Executive—by Executive Order—which is the very source of the program we confront and uphold herein.

of the Order to NOPSI is also authorized, for such action requires no extension of the regulation's coverage. The regulation incorporating by operation of the Order the nondiscrimination clause into every government contract would be a dead letter if the Government could not apply it to a government contractor like NOPSI, merely because the company refused to consent.

Although no circuit has confronted the precise legal issue today before us, we find the *Contractors Ass'n* case to be a very persuasive precedent. There the Third Circuit specifically considered the validity of the Philadelphia Plan, relating to minority hiring in federally-assisted construction projects, which was promulgated pursuant to Executive Order 11246. The court upheld the Plan, on the ground that it was within the implied authority of the President. Insofar as the Philadelphia Plan was instituted to implement the mandate of the Executive Order in a particular geographic area and industry, the court's holding clearly flowed from a view that the Executive Order program itself was valid, at least with respect to federally-assisted construction contracts. Moreover, in language on all fours, the Third Circuit specifically stated that Executive imposition of nondiscrimination contract provisions (including an affirmative action clause) in the Government procurement area is action pursuant to the express or implied authorization of Congress. 442 F.2d at 170. [Footnote 7 omitted.]

■ Liberty asserts the absence of legislative authority for E.O. 11246 on the ground that if E.O. 11246 relates to government procurement and was issued pursuant to the Executive's procurement powers, 40 U.S.C. § 486(a), any such Order and the regulations issued thereunder must directly control the quantity, quality or price of government property or affect government management and disposal of government property. There is, however, no legislative or other provision which requires that restrictive approach. Liberty also contends that if E.O. 11246 was issued pursuant to authority under the Civil Rights Act of 1964 or the 1972 amendments thereto, the Order renders Title VII superfluous. That contention also may not prevail. The legislative history indicates that the Civil Rights Act was passed with full congressional recognition of the existence of E.O. 11246 and its predecessors, and that Congress gave no indication that it considered the two programs incompatible. *See Weber v. Kaiser Aluminum & Chemical Corp.: The Challenge to Voluntary Compliance Under Title VII*, 14 Colum.J.L. & Soc.Prob. 123, 178–82 (1978). In fact, Congress twice rejected proposals to make Title VII the exclusive remedy for employment discrimination. Title VII, of course, applies to many companies and persons who are not government contractors.

While it is arguable that the regulations issued pursuant to E.O. 11246 could be upheld solely on the grounds that they are authorized by the Civil Rights Act, the courts have unanimously found the procurement powers themselves to be broad enough to encompass and authorize the social and economic objectives of E.O. 11246. *See NOPSI, supra*, 553 F.2d at 466–67. In *Rossetti Contracting Co., Inc. v. Brennan*, 508 F.2d 1039, 1045 n.18 (7th Cir. 1975), Judge Fairchild concluded that though the procurement process is utilized to achieve social and economic objectives only indirectly related to conventional procurement considerations, with only attenuated relationships to price, quantity or quality, that attenuation does not limit the power of Congress or the President to condition the award of a contract on full compliance with E.O. 11246. *See also Northeast Construction Co. v.*

*Romney,* 157 U.S.App.D.C. 381, 389–90, 485 F.2d 752, 760–61 (D.C. Cir. 1973) (Leventhal, J.).

Writing in *Contractors Ass'n of Eastern Pa. v. Secretary of Labor, supra,* 442 F.2d at 170–71, Judge Gibbons commented:

> [I]t is in the interest of the United States in all procurement to see that its suppliers are not over the long run increasing its costs and delaying its programs by excluding from the labor pool available minority workmen. In the area of Government procurement Executive authority to impose non-discrimination contract provisions falls in Justice Jackson's first category [in *Youngstown Sheet and Tube Company v. Sawyer,* 343 U.S. 579, 635–38, 72 S.Ct. 863, 96 L.Ed. 1153 (1952)]: action pursuant to the express or implied authorization of Congress.

> \* \* \* \* \* \*

> \* \* \* In direct procurement the federal government has a vital interest in assuring that the largest possible pool of

qualified manpower be available for the accomplishment of its projects. It has the identical interest with respect to federally assisted construction projects.[21]

In *Chrysler Corp. v. Brown,* 441 U.S. 281, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979), the Supreme Court had occasion to review the sources of legislative authority for E.O. 11246. *Chrysler* involved a "reverse" Freedom of Information Act (FOIA) claim in which Chrysler sought to enjoin the disclosure of certain affirmative action information provided to the Government pursuant to E.O. 11246 and the regulations thereunder. The issue before the Court was whether the disclosure regulations promulgated under E.O. 11246, and providing for disclosure above and beyond that required by FOIA, 5 U.S.C. § 552, constituted disclosure "authorized by law" so as to be an exception to the non-disclosure provisions of the Trade Secrets Act, 18 U.S.C. § 1905.[22]

In *Chrysler,* in the course of his consideration of E.O. 11246, Mr. Justice Rehnquist,

---

**21.** Liberty asserts that the procurement of workers' compensation insurance by government contractors is at most *indirect* procurement of such insurance by the government. However, the Third Circuit, in using the term "direct procurement," was referring to government contractors and subcontractors covered in Part II of E.O. 11246, which deals with contracts with the Federal Government, as distinguished from federally assisted construction projects, which constitute a kind of indirect federal procurement and which are the subject of another part of the Third Circuit's analysis and of Part III of E.O. 11246. *See* n.2 *supra.*

Liberty seeks to distinguish *Contractors Ass'n* because Judge Gibbons found actual discrimination present among contractors involved in that case. However, the rationale of Judge Gibbons applies equally to latent or potential discrimination since the latter, even in the absence of actual discrimination, may well raise federal procurement costs. In any event, the applicability of the affirmative action provisions of E.O. 11246 is not contingent upon a finding of past discrimination. *See Contractors Ass'n, supra,* 442 F.2d at 176–77.

**22.** The regulations at issue in *Chrysler* provide in relevant part:

§ 60–40.2 *Information available on request.*

(a) Upon the request of any person for identifiable records obtained or generated pursuant to Executive Order 11246 (as amended) such records shall be made available for inspection and copying, notwithstand-

ing the applicability of the exemption from mandatory disclosure set forth in 5 U.S.C. 552 subsection (b), if it is determined that the requested inspection or copying furthers the public interest and does not impede any of the functions of the OFCC or the Compliance Agencies except in the case of records disclosure of which is prohibited by law.

18 U.S.C. § 1905 provides:

Whoever, being an officer or employee of the United States or of any department or agency thereof, publishes, divulges, discloses, or makes known in any manner or to any extent not authorized by law any information coming to him in the course of his employment or official duties or by reason of any examination or investigation made by, or return, report or record made to or filed with, such department or agency or officer or employee thereof, which information concerns or relates to the trade secrets, processes, operations, style of work, or apparatus, or to the identity, confidential statistical data, amount or source of any income, profits, losses, or expenditures of any person, firm, partnership, corporation, or association; or permits any income return or copy thereof or any book containing any abstract or particulars thereof to be seen or examined by any person except as provided by law; shall be fined not more than $1,000, or imprisoned not more than one year, or both; and shall be removed from office or employment.

after observing (441 U.S. at 304, 99 S.Ct. at 1719, 60 L.Ed.2d at 226) that "[t]he origins of the congressional authority for Executive Order 11246 are somewhat obscure and have been roundly debated by commentators and courts," wrote (441 U.S. at 304–306, 99 S.Ct. at 1719–1720, 60 L.Ed.2d at 226–27):

> For purposes of this case, it is not necessary to decide whether Executive Order 11246 as amended is authorized by the Federal Property and Administration Services Act of 1949, Titles VI and VII of the Civil Rights Act of 1964, the Equal Employment Opportunity Enforcement Act of 1972, or some more general notion that the Executive can impose reasonable contractual requirements in the exercise of its procurement authority. The pertinent inquiry is whether under any of the arguable *statutory* grants of authority, the OFCCP disclosure regulations relied on by the Government are reasonably within the contemplation of that grant of authority. [Footnotes omitted; emphasis in original.]

Mr. Justice Rehnquist, however, did review the possible sources of statutory authorization for E.O. 11246 (441 U.S. at 304–306, nn. 34–37, 99 S.Ct. at 1719–1720, nn. 34–37, 60 L.Ed.2d at 226–27 nn. 34–37, inclusive) and observed that the procurement statute, 40 U.S.C. §§ 471–514, merely authorizes executive orders "necessary to effectuate [its] provisions," that it contains no express reference to employment discrimination, and that many of the judicial discussions of the procurement statute as the statutory basis for E.O. 11246 are dicta "without any analysis of the nexus between [that Act] and the Executive orders." (At n. 34). Nevertheless, Mr. Justice Rehnquist concluded his discussion of the Procurement Act by noting (at n. 34), without elaboration, the Third Circuit's holding in *Contractors Ass'n, supra,* that 40 U.S.C. § 486(a) "was authority for at least some aspects of Executive Order 11246 on the ground that 'it is in the interest of the United States in all procurement to see that its suppliers are not over the long run increasing its costs and delaying its programs by excluding

from the labor pool available minority workmen.' 442 F.2d, at 170."

The Justice also discussed the possible congressional authorization of E.O. 11246 under Titles VI and VII of the Civil Rights Act of 1964 and noted that those sections contained no *express* substantive delegation of authority to the President. He did not discuss the possibility of implied authorization (*see Youngstown Sheet and Tube Co. v. Sawyer,* 343 U.S. 579, 634, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) (Jackson, J., concurring)), but observed (at n. 35) that "[s]ignificantly, the question has usually been put in terms of whether Executive Order 11246 is inconsistent with these titles of the Civil Rights Act of 1964." Finally, Mr. Justice Rehnquist noted but did not elaborate upon the theory that the rejection of the series of amendments to the Equal Employment Opportunity Enforcement Act which were designed to cut back on the affirmative action efforts under E.O. 11246 may serve as implied congressional authorization.

Continuing, Mr. Justice Rehnquist (441 U.S. at 306–308, 99 S.Ct. at 1720–1721, 60 L.Ed.2d at 227–29) focused his consideration upon the specific regulation in question and whether or not it was within the scope of E.O. 11246 and any possible grant of legislative authority:

> We think that it is clear that when it enacted these statutes [Procurement Act, Titles VI and VII of the Civil Rights Act of 1964, 1972 amendments], Congress was *not concerned with public disclosure of trade secrets or confidential business information,* and, unless we were to hold that any federal statute that implies some authority to collect information must grant *legislative* authority to disclose that information to the public, it is simply not possible to find in these statutes a delegation of the disclosure authority asserted by the Government here.

The relationship between any grant of legislative authority and the disclosure regulations becomes more remote when one examines § 201 of the Executive order. It speaks in terms of rules and regulations "necessary and appropriate"

to achieve the purposes of the Executive order. Those purposes are an end to discrimination in employment by the Federal Government and those who deal with the Federal Government. One cannot readily pull from the logic and purposes of the Executive Order any concern with the public's access to information in Government files or the importance of protecting trade secrets or confidential business statistics.

The "purpose and scope" section of the disclosure regulations indicates two underlying rationales: OFCCP's general policy "to disclose information to the public," and its policy "to cooperate with other public agencies as well as private parties seeking to eliminate discrimination in employment." 41 C.F.R. § 60–40.1 (1977). The Government argues that "[t]he purpose of the Executive Order is to combat discrimination in employment, and a disclosure policy designed to further this purpose is consistent with the Executive Order and an appropriate subject for regulation under its aegis." Government Brief, at 48. Were a grant of legislative authority as a basis for Executive Order 11246 more clearly identifiable, we might agree with the Government that this "compatibility" gives the disclosure regulations the necessary legislative force. But the thread between these regulations and any grant of authority by the Congress is so strained that it would do violence to established principles of separations of powers to denominate these particular regulations "legislative" and credit them with the "binding effect of law."

This is not to say that any grant of legislative authority to a federal agency by Congress must be specific before regulations promulgated pursuant to them can be binding on courts in a manner akin to statutes. What is important is that the reviewing court reasonably be able to conclude that the grant of authority con-

templates the regulations issued. [Footnote omitted; emphasis in original.]

Thus, in *Chrysler*, the Supreme Court concluded that though an executive order concerning affirmative action through procurement may be related to the procurement powers, by reducing costs over the long run, or to the goals of the Civil Rights Act, and though disclosure of affirmative action information may be related to the goals of affirmative action, disclosure itself is not so closely related to either procurement or to civil rights as to have been reasonably contemplated by the Congress in considering either the Procurement Act or the Civil Rights Act.

Because of those attenuated links to any possible source of congressional authority, the Court held in *Chrysler* that the disclosure regulations were not "authorized by law" within the context of the Trade Secrets Act, 18 U.S.C. § 1905.[23]

Mr. Justice Marshall, concurring in *Chrysler*, wrote (441 U.S. at 320, 99 S.Ct. at 1727, 60 L.Ed.2d at 236):

Our conclusion that disclosure pursuant to the OFCCP regulations is not "authorized by law" for purposes of [18 U.S.C. § 1905, prohibiting disclosure of certain business and personal information unless authorized by law], however, does not mean the regulations themselves are "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" for purposes of the Administrative Procedure Act. 5 U.S.C. § 706(2)(C) [providing that courts shall hold agency action unlawful if in excess of statutory authority]. As the Court recognizes, * * *, that inquiry involves very different considerations than those presented in the instant case. Accordingly, we do not question the general validity of these OFCCP regulations or any other regulations promulgated under § 201 of Executive Order 11246. Nor do we consider whether such an Executive Order must

---

**23.** The Supreme Court further held that while section 1905 did not provide a private cause of action for Chrysler, action in violation of section 1905 could be reviewed in an action under section 10 of the Administrative Procedures Act, 5 U.S.C. § 702, allowing a person "adversely affected or aggrieved" by agency action to seek review of that action. The case was remanded to consider if the proposed disclosure would violate section 1905.

be founded on a legislative enactment. The Court's holding is only that the OFCCP regulations in issue here do not "authorize" disclosure within the meaning of § 1905.

In *Chrysler*, the Supreme Court tailored its considerations to the specific disclosure regulation under E.O. 11246 which was there in issue. The general guidance provided by the Court for considering regulations under an executive order is that "[w]hat is important is that the reviewing court reasonably be able to conclude that the grant of authority contemplates the regulations issued." (At 441 U.S. at 308, 99 S.Ct. at 1721, 60 L.Ed.2d 228–29). The Court was unable so to conclude in *Chrysler*, in which it was concerned with the tangential relationship between *any* of the possible sources of legislative authority for E.O. 11246 (which aimed at combating employment discrimination in federal procurement) and the extension of that authority to include regulations thereunder authorizing disclosure of certain business information collected pursuant to E.O. 11246. The Supreme Court's opinion in *Chrysler* does not undermine the sources of legislative authority for E.O. 11246 previously articulated by the Third, Fifth, Seventh, and District of Columbia Circuits. That the source of legislative authority may be "somewhat obscure" does not imply that it is nonexistent. Rather, the Court seemingly assumed that any or all of the possible sources of legislative authority for E.O. 11246 could provide an appropriate basis for that order.

E.O. 11246, § 201 provides for the adoption of "rules and regulations * * * necessary and appropriate to achieve the purposes" of ending discrimination by the Federal Government and those who deal with it. The regulations here in issue are not tangentially related to the express purpose of combating employment discrimination through government procurement but rather are directly aimed at implementing civil rights programs by requiring government subcontractors to submit specific affirmative action plans. The regulations here at issue are at the very core of the civil rights purpose of E.O. 11246. In fact, Liberty has not challenged the applicability of the provisions of E.O. 11246 and the regulations to subcontractors in general but merely maintains that if Liberty is deemed to be a subcontractor under the regulations, as this Court holds herein, then Liberty's relationship to federal procurement is too attenuated for the provisions of E.O. 11246 to be made applicable to it. This is not the situation addressed by the Court in *Chrysler*. In *Chrysler*, the regulation itself was considered unrelated to the furtherance of the avowed civil rights purposes of E.O. 11246. However, the fact that insurers of government contractors may be only incidentally related to a government project does not imply that the application of the affirmative action regulations to such insurers is too attenuated or too far removed from the express purpose of E.O. 11246 in the sense considered by the Supreme Court in *Chrysler*. The application of a regulation, well within the avowed purposes of the executive order, to an incidental subcontractor does not render the regulation outside the scope of either the executive order itself or the legislative authority for that order. The regulations here in question, as applied to Liberty, could reasonably have been contemplated by the grant of legislative authority and thus may validly be included within the scope of E.O. 11246.

As discussed by Judge Ainsworth in *NOPSI, supra*, and Judge Gibbons in *Contractors Ass'n, supra*, several sources of congressional authority reasonably support the issuance of E.O. 11246 concerning employment discrimination in government procurement. Whether the precise source of authority is the procurement statutes and the objective to minimize costs of government procurement by assuring the largest labor pool, or the Civil Rights Act of 1964 and the debates surrounding both the original and amended Acts, or whether the source of legislative authority is a combination of those and other sources, need not be determined herein since this Court is satisfied that E.O. 11246 is validly founded upon one or all of those sources of authority.

This Court will not dwell on Liberty's contention that E.O. 11246 is "illegal" because it would require Liberty to implement

certain affirmative action programs, allegedly in contravention of §§ 703(a) and (d) of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2(a) and (d). The record in this case at this time does not support that contention. In any event, as discussed *supra* at p. 711, the legislative history of Title VII indicates that that statute was passed with full congressional recognition of the existence of E.O. 11246 and that the Congress did not consider the affirmative action requirements of that Executive Order to be incompatible with the provisions of the Civil Rights Act. *See generally Contractors Ass'n, supra,* 442 F.2d at 173.

Accordingly, E.O. 11246 is valid and the regulations thereunder, as applied to Liberty, are valid exercises of administrative authority and within the scope of the executive order.

### Due Process

■■■ Liberty's ultimate challenge asserts the unconstitutionality of E.O. 11246 as violative of the due process clause of the Fifth Amendment. Liberty contends that Liberty's sale of workers' compensation insurance to employers who have contracts with federal government agencies does not in fact have any relation to those contracts or to the cost, progress or completion of work called for by them and that Liberty's employment policies do not affect the number or type of workers who are available to work for such employers on government contracts. That contention is essentially a restatement of Liberty's assertions, reviewed *supra,* that the administrative action is not within the powers conferred by Congress and that Liberty cannot be deemed to be a subcontractor. As so framed, the alleged constitutional violation is one of substantive due process. Judicial review of government action challenged as violative of the due process clause is narrow in scope and is limited to a determination of whether the government action is rationally related to a legitimate governmental interest. *See Kelley v. Johnson,* 425 U.S. 238, 247, 96 S.Ct. 1440, 1445, 47 L.Ed.2d 708 (1976). Whether a statute or an Executive

Order is unwise, improvident, or out of harmony with a particular school of thought is not for this Court to say. *Williamson v. Lee Optical Company,* 348 U.S. 483, 488, 75 S.Ct. 461, 464, 99 L.Ed. 563 (1955); *see North Dakota State Board of Pharmacy v. Snyder's Drug Stores, Inc.,* 414 U.S. 156, 164–67, 94 S.Ct. 407, 412–14, 38 L.Ed.2d 379 (1973). That is so because it is for the Congress in the case of a statute "to assess and weigh the various conflicting considerations," *Katzenbach v. Morgan,* 384 U.S. 641, 653, 86 S.Ct. 1717, 1725, 16 L.Ed.2d 828 (1966), and for the President so to do when promulgating an Executive Order. Courts accord very great deference to a legislature's judgment concerning the need for a statute or to a President's judgment concerning the need for an Executive Order. Indeed, such action by the Congress or by the President is entitled to a presumption of constitutionality. While there are more judicial decisions so deferring to the Congress, the same deference is judicially shown to the President if the Executive Order promulgated by him is within the scope of his constitutionally and/or statutorily conferred powers. *See NOPSI, supra,* 553 F.2d at 465; *Southern Illinois Builders Ass'n v. Ogilvie,* 327 F.Supp. 1154, 1162 (S.D.Ill. 1971), *aff'd,* 471 F.2d 680 (7th Cir. 1972); *Contractors Ass'n of Eastern Pa. v. Secretary of Labor,* 442 F.2d 159, 171 (3d Cir.), *cert. denied,* 404 U.S. 854, 92 S.Ct. 98, 30 L.Ed.2d 95 (1971); *Farmer v. Philadelphia Electric Co.,* 329 F.2d 3, 7–8 (3d Cir. 1964).

■■■ In this case, the challenged governmental action is that of the Federal Government acting in its proprietary capacity and not in its regulatory capacity. The anti-discrimination provisions of E.O. 11246 apply to Liberty only so long as Liberty chooses to supply necessary insurance to prime government contractors. Liberty has a choice of dealing or not dealing with those who contract with the Government. If it does not so choose, then Liberty need not comply with the provisions of the challenged E.O. 11246. The Government has broad powers to establish the terms pursuant to which it will or will not contract. Those powers are not unlimited—they may

not be exercised so as to discriminate or to violate constitutional rights—but they are very broad.[24]

Another thrust of Liberty's constitutional challenge raises two equal-protection-type arguments. The first is that not all federal agencies, by their regulations, require contractors to retain workers' compensation insurance. The second is that reliance in any part on the requirements of state legislation to establish the fact that workers' compensation insurance is "necessary" for a federal contractor results in federal contractors, and therefore their insurance carriers, being treated differently depending upon which state law is applicable in a given instance. Neither of those equal-protection-type claims has merit. To begin with, while the parties have cited a number of illustrations of federal regulations requiring workers' compensation,[25] neither Liberty nor the Government has referred to a single federal agency which does not require contractors to provide workers' compensation insurance. Secondly, all states require that certain employers carry workers' compensation insurance. The requirements of those laws differ but those differences are based on different needs and/or views and are not denials of equal protection. *Cf. Contractors Ass'n, supra,* 442 F.2d at 176. It is inevitable that the reach of E.O. 11246 and the regulations thereunder will vary geographically as the Federal Government and its contractors enter into contracts at different times and places, and as contractors and subcontractors perform federal work in the 50 states. That does not present any constitutional problem. In sum, all of Liberty's claims that E.O. 11246 is violative of due process are without merit.

### Fourth Amendment

In his October 22, 1977 letter to Liberty, defendant Friedman, after reiterating de-fendant's position that Liberty was covered by E.O. 11246 and after requesting Liberty to develop affirmative action programs, stated that "[i]t is our intention to conduct an on-site review of [the corporate headquarters], starting January 16, 1978." Thereafter, the Supreme Court, in *Marshall v. Barlow's, Inc.,* 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978), held that certain inspections under the Occupational Safety and Health Act were subject to the warrant requirements of the Fourth Amendment. After the *Barlow* decision, Liberty sought and was permitted to add an additional count to its within complaint. In that additional count, Liberty specifically alleged that a threatened, warrantless on-site inspection of Liberty would violate Liberty's rights under the Fourth Amendment to be free of unreasonable searches and seizures. However, in a hearing held in this matter on August 16, 1978, the Government bound itself not to conduct an on-site review of Liberty until the within case is decided by this Court and also agreed that if this case is decided adversely to Liberty, Liberty will be afforded the opportunity for an administrative determination concerning any on-site review, pursuant to 41 C.F.R. § 60–30, and that, further, if Liberty is not satisfied with such administrative determination, Liberty will be afforded a reasonable time in which to seek court review thereof. After the Government took that position, counsel for Liberty, during a proceeding on the record in open Court on August 16, 1978, stated that in view of the undertakings of government counsel set forth *supra,* Liberty is not presently pressing the Fourth Amendment point. That issue is accordingly not before this Court.

For the reasons set forth *supra* in this opinion, all of Liberty's challenges to E.O. 11246 must fail. Accordingly, judgment will be entered in this case for defendants.

---

24. *See Perkins v. Lukens Steel Company,* 310 U.S. 113, 127, 60 S.Ct. 869, 876, 84 L.Ed. 1108 (1940); *Southern Illinois Builders Ass'n v. Ogilvie,* 327 F.Supp. 1154, 1161 (S.D.Ill.1971), *aff'd,* 471 F.2d 680 (7th Cir. 1972). In *Southern Illinois,* the constitutionality and other validity of E.O. 11246 was upheld.

25. *See, e. g.,* 42 C.F.R. § 1–10.4 (1964) (fixed-priced contracts under the Defense Base Act), 41 C.F.R. §§ 7–10.4, 7–10.5 (1977) (Agency for International Development procurement regulations), 41 C.F.R. § 1–10.500 *et seq.* (1968) (cost reimbursement contracts).